# Commonwealth vs. Linrose Woodbine.

Suffolk. February 11, 2011. - March 28, 2012.

Present: Spina, Cordy, Botsford, Gants, & Duffly, JJ.

*Homicide. Constitutional Law,* Voluntariness of statement, Waiver of constitutional rights, Admissions and confessions. *Practice, Criminal,* Capital case, Voluntariness of statement, Motion to suppress, Admissions and confessions, Argument by prosecutor, Instructions to jury. *Evidence,* Voluntariness of statement, Admissions and confessions, Present recollection refreshed, Cross-examination. *Witness,* Refreshment of recollection, Cross-examination.

A Superior Court judge, in denying the criminal defendant's pretrial motion to suppress certain unrecorded statements that he gave to police while hospitalized, did not err in concluding that the defendant had received complete Miranda warnings, or in concluding that the Commonwealth had established beyond a reasonable doubt that the defendant knowingly, intelligently, and voluntarily waived his Miranda rights [727-729]; likewise, the judge properly concluded that the defendant's unrecorded statements were made voluntarily [729].

The judge at a murder trial did not err in admitting in evidence a statement that the defendant gave to police officers, where, even assuming that the defendant's earlier statement that he did not want to say anything at that time was a clear and unequivocal expression of his constitutional right to remain silent, the officers immediately ceased their questioning, waited seventeen hours before returning to question the defendant, and again read the Miranda warnings before questioning him. [729-730]

This court concluded that before a witness is permitted to testify at a criminal trial concerning an event after his or her memory has been refreshed by review, before taking the stand, of material that has been suppressed due to violation of the defendant's rights under the Fifth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights, the judge must conduct a voir dire to determine that such testimony reflects the witness's present memory of that event; therefore, at a murder trial where the judge failed to conduct such questioning of a witness (a police officer who testified concerning the defendant's unrecorded statement, after reviewing a subsequent recorded statement that had been suppressed because the defendant had invoked his right to counsel), the prejudice arising from such failure, exacerbated by the judge's limitations on the defendant's right to cross-examine the officer, created a substantial likelihood of a miscarriage of justice, when combined with an improper inference that the prosecutor, in closing argument, asked the jury to draw, and the lack of an instruction to the jury that, because there was no recording

of the particular statement about which the interrogating officer testified, they should weigh evidence of the defendant's alleged statement with great caution and care. [730-741] GANTS, J., dissenting.

INDICTMENTS found and returned in the Superior Court Department on April 16, 2004.

A pretrial motion to suppress evidence was heard by *Kenneth J. Fishman*, J., and the cases were tried before *Margaret R. Hinkle*, J.

*James L. Sultan* for the defendant.

*Macy Lee*, Assistant District Attorney, for the Commonwealth.

DUFFLY, J. On the night of December 15, 2003, the victim, Aston Dwayne Thompson, was shot and killed as he walked to his car parked behind an apartment building. Two guns were fired at the victim, and a third was fired into the street in front of the apartment building from the rear. Of the possible assailants, only one, the defendant, was apprehended; he was found near the scene of the shooting with a gunshot wound to the leg. A Superior Court jury convicted the defendant of murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty.[1]

The defendant's claims on appeal relate largely to statements he made to a detective while he was in custody in a hospital recovering from the gunshot wound. For strategic reasons, the detective chose not to record the first part of that interrogation, but he did record the second. After a hearing on the defendant's motion to suppress the entire interrogation, a Superior Court judge ruled that the statements made in the initial, unrecorded portion were admissible, but ordered that the recorded statements be suppressed.[2] The defendant contends that the motion judge erred in failing to suppress the unrecorded statement, and also that the trial judge erred in permitting the interrogating detective to testify to his memory of the unrecorded statement where the

---

[1]The defendant was tried also on a theory of felony-murder, but the jury rejected that theory. In addition, the defendant was convicted of unlawful possession of a firearm and unlawful possession of ammunition.

[2]The motion judge concluded that the tape-recorded statement had been obtained impermissibly during a custodial interrogation of the defendant after he had invoked his right to counsel under the Fifth Amendment to the United States Constitution. See note 11, *infra*.

source of that testimony was a transcript of the suppressed recorded statement that the detective had reviewed prior to trial.

The defendant asserts errors also in the dismissal of an unsworn seated juror during empanelment; certain limitations imposed by the judge on the defendant's cross-examination of a witness; and statements made by the prosecutor during closing argument that were not supported by the evidence. The defendant requests further that we exercise our authority pursuant to G. L. c. 278, § 33E, to reduce his conviction to a lesser degree of guilt or to order a new trial. Because a number of aspects of the trial, among them the detective's testimony concerning the defendant's unrecorded statements, prejudicial limitations on the defendant's right to cross-examine the detective, and certain of the prosecutor's remarks in closing argument, created a substantial likelihood of a miscarriage of justice, the defendant is entitled to a new trial.

*Background.* We summarize facts the jury could have found, reserving some details for later discussion. During the evening hours of December 15, 2003, the victim was at his friend Robert Hylton's apartment in the Dorchester section of Boston. Also in the apartment were Hylton's wife and son, and at least five other men who were socializing there.[3] Around 9:45 P.M., the victim left to purchase beer. As he walked to his automobile, which was in the parking area behind the building, multiple shots were fired; he suffered gunshot wounds to the head, chest, abdomen, arm, and wrist.

Hearing the gunshots, another guest demanded a weapon, and Hylton handed him something in a small paper bag. A short time later, more shots were heard coming from the front of the building. A private security guard who was working in the area, Wilson Jean-Philippe, was seated in his parked automobile a few houses down the street from Hylton's building when he heard the sound of gunshots. A man he later identified as the defendant ran up to his vehicle and, approaching on the driver's side, asked for help. Jean-Philippe refused the request. The

---

[3]Only two of the men at Robert Hylton's apartment on the night of the murder, David Berment and Gary Kerr, testified at trial. Both stated that they were inside the apartment at the time of the shooting. Berment testified that, of the men present that evening, three (other than the victim) were outside the apartment when the victim was shot.

defendant, who was bleeding from his left leg, began banging on the driver's side window, reiterating his pleas. When the defendant reached for something in his pants, Jean-Philippe drove away. Some time later, Jean-Philippe returned to where he had been parked. He found a gun on the ground with what appeared to be blood on it, and notified police officers at the scene.

When emergency personnel arrived at Hylton's apartment building, the victim was bleeding heavily from his wounds. He was transported by ambulance to a hospital, where he died of his injuries. Police interviewed Hylton and five of the men who had been in the apartment[4]; they also searched the surrounding area. Several shell casings were recovered in front of Hylton's apartment building. The gun found by Jean-Philippe, a .357 caliber semiautomatic with blood on the grips and barrel, was recovered near a neighboring building; the defendant was a possible source of deoxyribonucleic acid (DNA) found on the gun. A bullet recovered from the victim's body could have been fired from that weapon, and at least one other bullet, recovered from a pool of blood beneath the victim, also could have been fired from it.

A trail of blood led from the area where Jean-Philippe found the gun to the access ramp of a nearby building. Police found the defendant underneath the ramp, lying in the snow and bleeding from an apparent gunshot wound to his leg; he was in visible pain but responsive. After he was placed in an ambulance, Detective Sergeant Daniel Keeler read him the Miranda warnings from a card.[5] Shortly after midnight, Keeler arrived at the hospital with two other detectives; he again recited the Miranda warnings and obtained some biographical information from the defendant, but the defendant stated that he did not want to talk at that time, and the detectives left without further questioning.

On December 16, 2003, the day after the shooting, a warrant issued for the defendant's arrest on the murder charge. Shortly before 5 P.M., Keeler returned to the hospital with Detective

---

[4]Some of the men who had been in the apartment earlier were no longer present by the time police arrived. One theory of the defense was that some other culprit or culprits had shot the victim, in support of which the defendant focused on evidence that multiple individuals at the apartment that night may have been with the victim when he was shot.

[5]At that time, the defendant was charged only with unlawful possession of a firearm.

John Callahan. The defendant was lying in bed with an intravenous tube attached to one arm; he occasionally grimaced in pain, but was able to converse with the detectives. Keeler informed him that he was being charged with murder and recited the Miranda warnings from memory.[6] Keeler then told the defendant that he was in a "heap of trouble" but there were "two sides to every story," and he encouraged the defendant to talk to him. The defendant, who was upset and crying, asked to speak just with Keeler. Callahan left them alone in the room for ten to fifteen minutes; during that time, the defendant expressed concern for the safety of his family, then provided details of the shooting, including descriptions of two accomplices and his motive for participating. Afterward Callahan returned to the room, whereupon Keeler recounted what the defendant had told him as the defendant nodded in affirmation.[7]

*Proceedings.* To provide context for our later discussion, we summarize certain pertinent proceedings.

1. *Grand jury.* When Keeler appeared before the grand jury a few weeks after the murder, he testified that after he had served the murder warrant on the defendant at the hospital and advised the defendant of his Miranda rights, the defendant told him that he and another, unnamed individual had been solicited by a man to rob the victim; that they positioned themselves behind some trees in the back of an apartment building; and that the defendant and the unnamed individual approached the victim and shot him several times.[8] Asked to describe the defendant's "emotional state in terms of his wishes to talk to you," Keeler

---

[6]Detective Sergeant Daniel Keeler and Detective John Callahan both testified at trial that the defendant acknowledged his understanding of each Miranda warning as it was recited, but that he was not provided with written warnings and did not sign a form indicating he understood his rights.

[7]The jury did not learn that immediately after Keeler repeated to Callahan the defendant's initial statement, the defendant gave a second detailed confession, which was captured on an approximately twenty-five minute audio recording. Because the recorded interview ultimately was suppressed, the detectives' trial testimony purported to relate only to the unrecorded statement made by the defendant when he was alone with Keeler.

[8]Asked if the defendant had also given an earlier, contradictory account, Keeler testified that the defendant related initially that he had been walking down the street in front of the apartment building when "some guys" accosted him, and that he was shot while running from them.

responded, "Oh, [the defendant] expresses several times, 'I want to talk to you. I want to talk to you.' He actually talked to me a bit in the beginning alone, all post-Miranda. I then summoned Detective Callahan into the room. We took a tape-recorded statement from [the defendant], which chronicled the robbery, the shooting, and what led up to it." A copy of the tape recording was provided to the grand jury.

2. *Hearing on the motion to suppress.* A hearing on the defendant's motion to suppress was held in December, 2005, two years after the shooting. Defense counsel had made a transcript of the defendant's recorded statement and, in anticipation of his cross-examination of Keeler, provided copies to him and to the prosecutor. Keeler stated that he had reviewed the transcript for five to ten minutes immediately prior to the hearing.

Keeler testified that when he and Callahan went to the defendant's hospital room around 5 P.M. on December 16, 2003, and told the defendant that he was going to be charged with murder, the defendant became upset and, after a brief conversation, asked to speak to Keeler alone. According to Keeler, the conversation that followed was not "that long." Keeler testified that when Callahan left the room, "[the defendant] was crying, I'm in a lot of trouble, blah, blah, blah, blah. . . . He gave me a brief little thing in the beginning of what happened. That it wasn't supposed to go down that way."[9] Keeler said that he had neither taken notes nor written a report about the defendant's initial statement, and explained that he had chosen not to tape record that part of the interrogation because doing so might have had a "chilling effect" on his interactions with the defendant.[10]

The motion judge denied the defendant's motion to suppress the unrecorded statement, finding credible the testimony that Miranda warnings had been given and that the defendant's

[9]Keeler testified further that he said to the defendant, "[L]et's talk about what happened," and when asked by the prosecutor how the defendant responded, Keeler said, "I don't recall a specific . . . response to what he said. I know in the beginning the dialogue I had with him was trying to get him to enter into a conversation." Keeler could not "recall exactly what was said there."

[10]In his ruling on the admissibility of the defendant's statements, the motion judge made no findings of fact as to what details of the shooting the defendant relayed during the unrecorded portion of his interrogation.

initial statement was made voluntarily. He allowed the motion to suppress the recorded statement, however, because he concluded that the second portion of the interview took place after the defendant had invoked his right to counsel.[11]

3. *Motions in limine.* During the trial, on the day before Keeler was to testify, defense counsel made an oral motion to prevent Keeler from refreshing his recollection about the unrecorded statement with the transcript of the suppressed statement. Learning that Keeler had already reviewed the transcript, the judge concluded the issue was moot. The following day, defense counsel filed a written motion seeking to limit Keeler's testimony to include only "evidence elicited before the [g]rand [j]ury or at the [s]uppression [h]earing, excluding any evidence that may give the jury any indication that there was a suppressed taped interview"; the judge denied the motion "as drafted." Counsel continued to press his claim, arguing that allowing Keeler to testify about his recollection of the unrecorded statement, and to include details Keeler had not previously recalled and testified to, would permit the prosecution to introduce statements that had been suppressed. The judge expressed concern that restricting Keeler's testimony as requested would "not do justice" because "it's also a question of [Keeler's] memory today." The judge then conducted a brief voir dire in order to assess whether Keeler had "a legitimate basis for his knowledge [of the unrecorded

---

[11]The transcript of the tape recording reveals that immediately after Keeler reminded the defendant of his right to an attorney, the two engaged in the following dialogue:

THE DEFENDANT: "Where's the lawyer?"

KEELER: "Where is the lawyer?"

THE DEFENDANT: "Yes."

KEELER: "Well, I told you you have the right to have a lawyer, Linrose, if you wanted, right?"

THE DEFENDANT: "Yeah."

KEELER: "And did you start crying and say that you wanted to speak with me?"

After that exchange, Keeler proceeded to elicit from the defendant details of the shooting. Near the end of the interview, after Keeler had advised the defendant to tell his counsel at arraignment what he had said during the interrogation, the defendant replied, "I wish I could have spoken to him before though."

statements] other than in the tape."[12] Following the voir dire, the judge ruled that, with two minor exceptions on topics for which Keeler stated that he had no independent memory, Keeler could testify to all of the defendant's unrecorded statement.[13]

*Discussion.* 1. *Motion to suppress.* The defendant contends that the motion judge should have allowed his motion to suppress all of the statements he gave to the police, unrecorded as well as recorded. He argues that the judge erred in finding that Keeler gave the defendant each of the required warnings under *Miranda* v. *Arizona,* 384 U.S. 436 (1966) (*Miranda*); that the defendant's Miranda waiver was knowing and voluntary; and that his subsequent statements were given voluntarily. In reviewing the denial of a motion to suppress statements, we "independently apply constitutional principles to the facts, but defer to the motion judge's findings of fact unless they are clearly erroneous." *Commonwealth* v. *Leahy,* 445 Mass. 481, 485 (2005). We conclude as to each of the three claims that the motion judge correctly denied the defendant's motion to suppress.

Although Keeler gave incomplete Miranda warnings when he was asked on cross-examination to recite them from memory, the motion judge found credible Keeler's testimony that he gave the defendant accurate and complete Miranda warnings from memory after arriving at the hospital in the late afternoon of December 16 and notifying the defendant that he had been charged with murder. The motion judge based his finding on "Keeler's considerable experience, his testimony on direct examination, the circumstances surrounding the initial recitation of the warnings . . . , and the defendant's acknowledgment during the subsequent taped statement that he had received his rights."[14] The judge also credited the testimony of another

---

[12]Concerned about "taking time away from the jury," the judge conducted the initial voir dire of Keeler, allotting fifteen minutes, and then allowed the prosecutor and defense counsel eight minutes each to pose further questions.

[13]The prosecutor represented that Keeler had informed him that he had no memory of two points recorded on the audiotape: the discussion of what kind of car the defendant's accomplices used, and the defendant's explanation of how he got to the back of the apartment building before the victim was shot.

[14]We note that a police officer's testimony that a defendant acknowledged having been informed of the Miranda rights does not, without more, corroborate the same police officer's testimony that he fully and accurately

detective, who was present during Keeler's first visit to the hospital early in the morning on December 16, that he heard Keeler give complete Miranda warnings to the defendant, and that the defendant responded that he understood them. The judge did not err in concluding that the defendant received complete Miranda warnings.

The defendant claims also that the Commonwealth failed to establish beyond a reasonable doubt that he knowingly, intelligently, and voluntarily waived his Miranda rights. See *Commonwealth* v. *Lopes*, 455 Mass. 147, 167 (2009). The motion judge found that, "although in the hospital recovering from a gunshot wound, [the defendant] was oriented, responsive, and not exhibiting any level of confusion." While noting that the defendant had not graduated from high school and lacked experience with the criminal justice system, see *Commonwealth* v. *Anderson*, 445 Mass. 195, 203 (2005), the judge stated also that "the evidence suggests that it was the defendant who indicated a desire to speak with . . . Keeler privately, apparently motivated by his concern for the safety of his family and his desire to keep his cooperation with the police secret." See *Commonwealth* v. *Groome*, 435 Mass. 201, 217 (2001) (defendant knowingly and voluntarily waived his right to silence where he initiated conversation with police).

Furthermore, there was no evidence that the defendant had been administered medications of a type, and in amounts, that would have impaired his ability to think clearly, or that his condition was such that he could not comprehend what the detectives were saying. Cf. *Commonwealth* v. *Johnson*, 371 Mass. 862, 869-870 (1977). The defendant points out that Keeler arrived at the hospital in the late afternoon of December 16, 2003, hoping to obtain a confession from the defendant, and suggests that this supports an inference that the defendant's incriminating statements were coerced. We do not agree that

recited the Miranda warnings. A defendant is not presumed to know the Miranda rights, or to understand whether the warnings given fully comport with the officer's obligation. To ensure that defendants are fully and accurately informed of their rights, we strongly encourage police to read the Miranda warnings from a preprinted card rather than attempting to recite them from memory. See *Commonwealth* v. *Dagraca*, 447 Mass. 546, 551-552 & n.7 (2006), citing *Commonwealth* v. *Lewis*, 374 Mass. 203, 204-205 (1978).

Keeler's statement, standing alone, supports the inference the defendant asks us to make. See *Commonwealth* v. *Mello*, 420 Mass. 375, 384 (1995). The record amply supports the motion judge's conclusion that the defendant's waiver was knowing and voluntary.

Based in essence on the same arguments advanced by the defendant to support his claim that he did not waive his Miranda rights, the defendant contends that his statements also were not voluntarily made. "The voluntariness of the waiver on the basis of Miranda and the voluntariness of the statements on due process grounds are separate and distinct issues but they are both determined in light of the totality of the circumstances and they share many of the same relevant factors." *Commonwealth* v. *Edwards*, 420 Mass. 666, 673 (1995). In determining whether the defendant's statements were voluntary, we consider whether the statements "were the product of a 'rational intellect' and a 'free will.' " *Id.*, quoting *Commonwealth* v. *Selby*, 420 Mass. 656, 662 (1995). The defendant does not contend that Keeler employed falsehoods, deception, or trickery to elicit the statements, see *Commonwealth* v. *Selby*, *supra* at 664, or that the defendant was given assurances of leniency if he confessed. See *Commonwealth* v. *DiGiambattista*, 442 Mass. 423, 437 (2004) (*DiGiambattista*). Further, the motion judge found that it was the defendant who sought to speak to Keeler alone, and the defendant does not contend that he was unable to exercise his free will in doing so. See *Commonwealth* v. *Edwards*, *supra*. See also *Commonwealth* v. *Martinez*, 458 Mass. 684, 694 (2011). Therefore, it was not error for the motion judge to conclude that the defendant's unrecorded statements were made voluntarily.

2. *Right to remain silent.* The defendant contends that, because he invoked his right to silence shortly after he was admitted to the hospital, police violated that right when they returned to question him on the same subject nearly seventeen hours later. Citing *Michigan* v. *Mosley*, 423 U.S. 96 (1975), the defendant argues that because he had invoked his right to silence, he had a right, before any new questioning, to "control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation." *Id.* at 103-104. In that case, following proper Miranda warnings, the defendant was questioned about an armed

robbery, but officers ceased their questioning when the defendant told them that he had nothing more to say about the robbery. *Id.* at 104. Several hours later, after again administering Miranda warnings, a different officer questioned the defendant about an unrelated murder. *Id.* In denying the defendant's motion to suppress the second statement, the United States Supreme Court determined that the defendant had invoked his right to silence during the initial interrogation, but concluded that, under the circumstances presented, the police had "scrupulously honored" his exercise of that right. *Id.* at 104, 105-106.

When Keeler and two other detectives arrived at the hospital shortly after midnight on December 16, the defendant was still in the emergency room; he had been there for no more than one hour. His purported invocation consisted of telling the detectives, "I don't want to say anything right now," and they left without questioning him further. Although we cannot say on this record that the remark was clearly and unequivocally an expression of the defendant's constitutional right to remain silent, see *Commonwealth* v. *Leahy*, 445 Mass. 481, 488 (2005) ("Whether invocation of the right is clear and unequivocal is to be determined by the totality of the circumstances"), it was not error to admit the defendant's subsequent statement where the officers immediately ceased their questioning, waited seventeen hours before returning to question the defendant, and again read the Miranda warnings before questioning him.

3. *Police witness's testimony.* The defendant challenges the admission at trial of Keeler's detailed testimony concerning the contents of his unrecorded statement. He argues that, in the circumstances, Keeler could not have had an independent memory of the defendant's unrecorded statement, and that Keeler's trial testimony, which came after he had reviewed the subsequent recorded statement at least twice, effectively allowed portions of the suppressed statement to be placed before the jury. We conclude that the admission of Keeler's testimony without first establishing that it reflected Keeler's present memory of the defendant's unrecorded statement, in combination with other issues, see *infra*, gave rise to a substantial likelihood of a miscar-

riage of justice.[15] See *Commonwealth* v. *Randolph*, 438 Mass. 290, 294 (2002).

In *Commonwealth* v. *O'Brien*, 419 Mass. 470, 478-479 (1995), we set forth fundamental requirements regarding refreshing a witness's memory. A witness whose memory has been exhausted may have that memory refreshed in the presence of the jury by any means that permits the witness to testify from his or her own memory. *Id.* at 478. We have recognized also that a witness may at times review a document prior to testifying in order to refresh his or her memory and better prepare to testify. See *id.* at 479 & n.5; *Commonwealth* v. *Marsh*, 354 Mass. 713, 721-722 (1968). See also Mass. G. Evid. § 612(b) (2011). In certain circumstances, memory may be refreshed by evidence that is itself inadmissible. See, e.g., *Commonwealth* v. *Levine*, 280 Mass. 83, 90-91 (1932). However, we are aware of no appellate decision in the Commonwealth that addresses the particular concern the defendant raises here: the use of evidence that has been obtained in violation of the defendant's invocation of his rights under *Miranda*, and ordered suppressed, to refresh a witness's testimony before a criminal trial.

We do not decide today that it is impermissible for a witness to testify concerning an event after his memory has been refreshed by his review, before taking the stand, of material that is suppressed due to violations of a defendant's rights under the Fifth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. However, before such a witness is permitted to testify, the judge must ensure that the Commonwealth has met its burden of establishing that the witness will testify not from a memory of the suppressed statement, which by definition is not to be placed in evidence, but from an independent memory of the separate event. This requires that the judge conduct a voir dire through which the basis for the witness's assertion that he or she has a present recollection of the separate event may be thoroughly examined.

In the ordinary circumstance, where a witness has been

---

[15]It is unclear from the record whether the defendant preserved his challenge to Keeler's testimony regarding the unrecorded statement. In light of our conclusion that multiple issues at trial together created a substantial likelihood of a miscarriage of justice, we need not answer the question.

questioned on the stand and is unable to recall the subject of that questioning, the witness must state that his or her memory is exhausted before counsel may, in the presence of the jury, seek to refresh the witness's memory by means of a document. In this way, the jury have been made aware of the limitations of the witness's memory and the areas that could not initially be recalled, and they see that the witness has reviewed a document before asserting that he now has a memory. Opposing counsel may seek to impeach the witness by invoking the witness's prior inconsistent statements on the subject, thus permitting the jury to conclude that the testimony derived wholly from the review of the document, or by introducing the document itself into evidence to show that it could not have aided the witness as claimed. See Mass. G. Evid., *supra* at § 612(a). See also *United States* v. *Rappy,* 157 F.2d 964, 967-968 (2d Cir. 1946), cert. denied, 329 U.S. 806 (1947).

However, when memory is refreshed prior to trial with a document that the jury cannot consider because it has been suppressed, the witness appears before the jury with developed testimony that does not reflect a prior inability to recall. Impeachment with prior statements of the witness is less effective, and the jury do not have the opportunity to consider whether the witness's detailed trial testimony is based on a memory of the event or instead derived from the review of the document. Absent the opportunity for full and effective cross-examination directed to the possible sources of that testimony, it will appear to the jury that the testimony was based solely on the witness's present memory of the event.

In this case, where the jury lacked knowledge of the suppressed tape recording that Keeler had used to refresh his memory, the prosecutor had a powerful advantage. One of the most potent ways to attack the credibility of a witness who has refreshed his memory, whether prior to or during his testimony, is to use the refreshing material itself to attack the existence, extent, or accuracy of that witness's memory. See *United States* v. *Rappy,* *supra* at 968.[16] See also *United States* v. *Riccardi,* 174 F.2d 883, 888 (3d Cir.), cert. denied, 337 U.S. 941 (1949) (at trial, witness's

---

[16]As Judge Learned Hand noted:

"Anything may in fact revive a memory: a song, a scent, a photograph,

"capacities for memory and perception may be attacked and tested; his determination to tell the truth investigated and revealed; protestations of lack of memory . . . merely undermine the probative worth of his testimony"). Here, however, the suppressed statement could not be presented for any purpose, resulting in a risk that the jury gave greater credibility to Keeler's testimony than would be warranted otherwise. Counsel was unable to test Keeler's testimony by reference to anything the defendant might have said during the recorded interrogation; he could not point out that the allegedly refreshing document was not in fact a record of the interrogation to which Keeler was testifying, and he could not even inform the jury that Keeler had refreshed his memory.

The prosecutor elicited from Keeler testimony about statements made by the defendant four years prior to trial — statements that were made during what Keeler himself had previously described as, in essence, a priming of the pump, by which he hoped to gain the defendant's trust and elicit a confession that he could then record. The detective did not make notes of the initial interview, and, by his own choice, it was not recorded. Before the grand jury and at the suppression hearing, Keeler testified that the initial, unrecorded interview was brief[17]; and when he testified during those proceedings about the defendant's statements, it was apparent that the detective was being asked to testify about the statements he had recorded.[18]

---

[an] allusion, even a past statement known to be false. When a witness declares that any of these has evoked a memory, the opposite party may show, either that it has not evoked what appears to the witness as a memory, or that, although it may so appear to him, the memory is a phantom and not a reliable record of its content. When the evoking stimulus is not itself an account of the relevant occasion, no question of its truth can arise; but when it is an account of that occasion, its falsity, *if raised by the opposing party, will become a relevant issue if the witness has declared that the evoked memory accords with it.*"

*United States* v. *Rappy*, 157 F.2d 964, 967-968 (2d Cir. 1946), cert. denied, 329 U.S. 806 (1947).

[17]Keeler testified at trial that he spoke to the defendant alone for about fifteen minutes. Detective Callahan testified that Keeler spoke to the defendant alone for ten to fifteen minutes. The recorded interview lasted approximately twenty-five minutes.

[18]We disagree with the dissent that the defendant's motion in limine concedes

The trial judge was appropriately concerned that Keeler might not be able accurately to distinguish in his own mind the statements the defendant made in the first interview from those made in the second.[19] See *DiGiambattista, supra* at 446 ("Even assuming the most conscientious and good faith efforts of an interrogating officer, and even aided by a contemporaneous written statement or summary report, the officer can at best reconstruct only a portion of what was said over the course of an interrogation conducted months and oftentimes years prior to the time the officer testifies").[20]

The judge was aware of the complexity of the issues and gave careful consideration to their resolution. Nonetheless, her solution was not adequate.[21] Given the passage of time and

that the defendant made detailed admissions in his unrecorded statement to which Keeler would be permitted to testify. *Post* at 746. Based on the defendant's motion and his counsel's argument at the hearing on the motion, it is apparent that counsel believed Keeler would be limited to testifying that very little had been said by the defendant during the unrecorded portion of the statement.

[19]"Testimony that has been recorded verbatim in a formal proceeding, such as grand jury testimony, allows for reasonable precision in establishing the statement's content . . . . By contrast, oral statements to police officers recorded only in brief notes are more difficult to reconstruct accurately and pose risks of improper evidence-shaping and selective memory. Most troubling are entirely unrecorded statements, recounted in court from memory by a supposed hearer of the statement." (Footnotes omitted.) Note, What Remains of the "Forfeited" Right to Confrontation? Restoring Sixth Amendment Values to the Forfeiture-by-Wrongdoing Rule in Light of *Crawford* v. *Washington* and *Giles* v. *California*, 85 N.Y.U. L. Rev. 1291, 1317-1318 (2010). See also Recent Legislation: Evidence Law — Hearsay Rule — California Adopts Hearsay Exception Making Written Statements by Unavailable Witnesses That Describe Past Physical Abuse Admissible in Civil and Criminal Cases, 110 Harv. L. Rev. 805, 809 (1997) (unrecorded verbal statements made to police officers are subject to distortion as officers' memories fade).

[20]That concern was heightened here, where the refreshing document contained statements that had been suppressed and could not be presented to the jury. Compare *United States* v. *Baratta*, 397 F.2d 215, 221, 222 (2d Cir.), cert. denied, 393 U.S. 939 (1968) (during defendant's cross-examination, prosecutor handed him incriminating writing that was "inadmissible in evidence under the doctrine of Miranda," and asked if it refreshed his recollection; no error where writing was not admitted in evidence or identified as admission). Because Keeler used a transcript of the suppressed interview to refresh his memory of the statement he had chosen not to record, there was considerable risk that the jury would hear the defendant's improperly obtained confession.

[21]The judge's efforts were impeded by the fact that defense counsel did not

Keeler's recent refreshing of his memory, it was incumbent on the judge to take the steps necessary to ascertain whether, to what extent, and by what means Keeler was able to distinguish between what was contained in the document he reviewed and what he actually remembered taking place. See *20th Century Wear, Inc.* v. *Sanmark-Stardust Inc.*, 747 F.2d 81, 93 n.17 (2d Cir. 1984), cert. denied, 470 U.S. 1052 (1985) (judge required to determine "that the witness actually has a present recollection and that otherwise inadmissible evidence does not slip in inadvertently for its truth"). Cf. *Commonwealth* v. *Kater*, 388 Mass. 519, 528-529 (1983) (testimony from hypnotized witness in murder case inadmissible because, among other considerations, there was no way to distinguish "actual memory" from "pseudomemories" in hypnotic sessions, but witness could testify to prehypnotic memories, which should be preserved by "careful record"); *Frio* v. *Superior Court of Los Angeles County*, 203 Cal. App. 3d 1480, 1495 (1988) (remanding, in civil case, for determination whether witness who had reviewed illegally obtained recording and notes of same prior to trial enjoyed present recollection of recorded events). To make this determination, the judge was required to examine the foundations of Keeler's claim to a present and independent recollection. See *United States* v. *Riccardi, supra* at 889.

However, such an examination did not occur. Prior to conducting the voir dire, the judge engaged the prosecutor and defense counsel in a search of the transcript of the recorded, suppressed interview[22] in an effort to glean from it which of the defendant's

bring the motion in limine until the day before Keeler's anticipated testimony, although he had been aware of the issues surrounding Keeler's testimony at least two years prior to trial.

[22]The prosecutor argued to the trial judge that the leading nature of Keeler's questions to the defendant could only be explained as following up on statements made during the unrecorded portion of the interview, a proposition with which the judge agreed. Our review of the transcript, however, leads us to doubt that assumption as to many of Keeler's questions. And even if certain questions suggested knowledge of information that had been provided previously by the defendant, this argument misses the mark. The inquiry should have focused on whether the detective had an actual memory that was based on his independent recollection of the defendant's unrecorded statement. Moreover, the fact that Keeler posed leading questions to the defendant during the recorded interrogation does not in itself prove the contents of the defendant's statements during the unrecorded part of the interview.

recorded statements had also been made in the earlier, unrecorded interview.[23] During the voir dire, the judge repeatedly asked Keeler what, if anything, the defendant had said in his unrecorded statement on a given topic. She did not attempt to elicit the source of Keeler's recollection or probe how he could be certain that he was testifying from actual memory of statements that he had been unable to recall in any detail at the suppression hearing two years earlier, rather than from the suppressed interview.[24]

That Keeler was at the time of trial able to recite details of statements made by the defendant does not, without more, establish that his recitation was based on his actual memory of the defendant's statements in the first interview. Cf. *United States* v. *Rappy*, 157 F.2d 964, 967-968 (2d Cir. 1946) (where

[23]Examination of the transcript of the suppressed statement and of Keeler's testimony in prior proceedings could properly have been used in connection with the judge's investigation into the foundations of Keeler's claim that he had a present and independent recollection. But the judge did not ask Keeler to explain why, for example, he had been unable to recall the defendant's unrecorded statement when asked about it at the suppression hearing, and on what basis he could recall details of that statement two years later. Indeed, a review of Keeler's testimony over time reveals a developing assurance as to his ability to recall the unrecorded conversation and an increasingly sharp memory of the details of the earlier statements — details that hew ever closer to those made in the recorded statement. As one example, when the defendant was asked during the recorded interview about the number of shots fired, he answered and then immediately corrected himself. At the voir dire and at trial, Keeler testified that the defendant gave the same answer, including the self-correction, during the unrecorded interview.

Similarly, the judge considered the transcripts of the grand jury and suppression hearings to determine whether, on those occasions, Keeler had testified about the defendant's initial statement. As previously stated, Keeler's testimony at those hearings apparently focused on the contents of the defendant's recorded statement; they thus do not provide a basis to conclude that Keeler's memory of the unrecorded statement was properly refreshed and that the suppressed interview was not the source of his testimony at trial.

[24]Keeler did not take notes during either portion of the interview, and he did not make a written report. Detective Callahan did write a report, but in lieu of including the substance of the interview, it referenced the tape recording. Because the transcript was not of the interview about which Keeler would be testifying, it was also not a reliable source for that testimony as careful, contemporaneous notes of the first interview might have been. See *Frio* v. *Superior Court of Los Angeles County*, 203 Cal. App. 3d 1480, 1496 (1988) (witness's careful notes more likely prevent rather than encourage invention, and witness's memory might remain more constant than if notes did not exist).

witness declares that item or writing has evoked memory, it may be shown "either that it has not evoked what appears to the witness as a memory, or that, although it may so appear to him, the memory is a phantom and not a reliable record of its content"). Notwithstanding the judge's efforts, we cannot conclude on the basis of this record that the source of Keeler's testimony was his memory of what the defendant said in the first unrecorded interview, rather than his memory of the second recorded and transcribed interview that was suppressed. See *Commonwealth* v. *Kater, supra.*

The prejudice to the defendant arising from Keeler's trial testimony about the defendant's statement was exacerbated by the judge's limitations on the defendant's right to cross-examine Keeler. Prior to trial, the Commonwealth moved to limit any challenge to Keeler's memory of the unrecorded statement, arguing that such a challenge would open the door to the admission of the suppressed statement. At a hearing on the motion, the judge expressed concern that allowing the defendant to suggest on cross-examination that Keeler had no record of his interview of the defendant would invite the jury to draw a false inference. Accordingly, although the judge did not allow the Commonwealth's motion and advised defense counsel that Keeler could "be impeached in any way that is appropriate," she warned counsel that she would not permit him to dwell on the issue of Keeler's failure to take notes during the unrecorded interview; counsel was permitted to question Keeler about notetaking only once, or risk the Commonwealth being allowed to introduce the suppressed statement in rebuttal. Counsel assured the judge that "what I am trying to do at all costs is avoid opening the door into a taped confession of [the defendant] at this trial." Accordingly, during his brief cross-examination, he elicited from Keeler only once that Keeler took no notes of the interview, and he made no attempt to challenge Keeler's memory.

The judge's orders concerning cross-examination substantially hindered the defendant's ability to challenge Keeler's testimony, testimony that provided an important, if not the key, piece of evidence against the defendant in the Commonwealth's case. See *DiGiambattista, supra* at 447 (exceptionally potent quality of defendant's statement or confession is magnified when evidence

of that statement or confession is presented by interrogating officers). Although the Commonwealth presented other evidence linking the defendant to the scene of the shooting, "[t]here is no dispute that the evidence of a defendant's alleged statement or confession is one of the most significant pieces of evidence in any criminal trial." *Id.* at 446. Moreover, the statement attributed to the defendant supported the Commonwealth's theory that the murder was premeditated and contradicted the theory of the defense that the defendant was himself an unfortunate victim at the scene of the crime. Contrast *Commonwealth* v. *Coleman,* 366 Mass. 705, 711 (1975) (improperly admitted evidence innocuous when evidence did not contradict defense theory).

"The limits of cross-examination ordinarily rest in sound judicial discretion. However, reasonable cross-examination for the purpose of showing falsity of other testimony of the witness as to the main issues of the trial, or bias and prejudice on his part, is a matter of right." *Commonwealth* v. *Carroll,* 360 Mass. 580, 589 (1971). Here, the judge's restriction of the defendant's right to cross-examine amounted to an abuse of discretion. It is the Commonwealth that must bear the consequences of a police officer's decision not to record an interrogation. See *DiGiambattista, supra.* By restricting the defendant's right to challenge Keeler's testimony, and by suggesting that broader cross-examination might open the door to introduction of the suppressed statement, the judge effectively relieved the Commonwealth of its burden and shifted it to the defendant.

4. *Closing argument.* In closing, the prosecutor asked the jury to draw an improper inference that Callahan had memorialized in a written report the entire unrecorded statement the defendant made to Keeler.[25] See *Commonwealth* v. *Murchison,* 418 Mass.

---

[25]The prosecutor argued:

"I want to be clear, the original statement is a statement to Detective Keeler. What do we have after that? We have Detective Callahan coming in the room and what happens? There's a conversation that ensued. The defendant's nodding, Detective Keeler's speaking. Detective Callahan writes the report. Detective Callahan incorporates what the defendant has said. There was a report written on that statement, ladies and gentlemen. Don't be confused, don't be misled. The report is written by Detective Callahan concerning what happened when he came back in that room. He wrote a report."

58, 59-60 (1994) (although "[c]ounsel may argue from the evidence and may argue fair inferences that might be drawn from the evidence," arguments not so supported are improper). Although Callahan had, in fact, testified to having written a report, the prosecutor knew that the report contained not a memorialization of the defendant's unrecorded statement, but only a reference to having made a recording of the suppressed statement.[26]

The prosecutor's argument was not a fair inference from the evidence. Indeed, as just indicated, the prosecutor had to have known that the inference was not only inaccurate but highly, and unfairly, misleading. Contrast *Commonwealth* v. *Caillot*, 454 Mass. 245, 258-259 (2009), cert. denied, 130 S. Ct. 1527 (2010) (no substantial likelihood of miscarriage of justice where prosecutor did not know, and reasonably should not have known, that factual statement in closing argument was false). The prosecutor's improper argument substantially amplified the errors concerning the inadequate inquiry into Keeler's memory of the defendant's unrecorded statement and the limitations on cross-examination of Keeler.

5. DiGiambattista *instruction.* Pursuant to our power of review under G. L. c. 278, § 33E, we consider an error not objected to by the defendant at trial and not raised in his appeal to this court. Before trial, the Commonwealth filed a motion requesting that no instruction be given pursuant to *DiGiambattista*, on the ground that such an instruction would falsely imply to the jury that no statement of the defendant was ever recorded. The judge did not give the instruction, stating that a defendant "cannot benefit from a *DiGiambattista* charge in a situation where a judge has decided that the statement that is [recorded] is suppressed," and that giving an instruction would distort reality "when, in fact, he was [recorded]." The defendant acquiesced to this view and did not request an instruction.

The defendant's statements were separate and distinct parts of a two-stage interrogation. It was "the strategic decision of

---

[26]During the final pretrial hearing, the judge asked the prosecutor, "Is there a separate police report with regard to the oral statement?" The prosecutor responded, "There is not." The prosecutor informed the judge that Callahan had made no report "because then they put him on tape," and later stated that Callahan's report "indicates that there's a conversation with the defendant and then it says 'see taped interview.' "

the interrogating officer" not to record both, *id.* at 446, and the police cannot capitalize on their decision to record only a portion of the interrogation in this fashion. See *id.* at 444. As we stated in *DiGiambattista*, it is only from "a complete recording of the entire interrogation that produced such a statement or confession, [that a fact finder] can evaluate its precise contents and any alleged coercive influences." *Id.* at 446. Thus, in circumstances such as those present here, where the interrogation was not recorded in its entirety and the recorded portion was suppressed, the jury should have been instructed that, because there was no recording of the particular statement about which the interrogating officer testified, "the State's highest court has expressed a preference that such interrogations be recorded whenever practicable," and that "they should weigh evidence of the defendant's alleged statement with great caution and care."[27] *Id.* at 447-448. At a new trial, a *DiGiambattista* instruction should be given on defense counsel's request.

*Conclusion.* Taken as a whole, we conclude that the above errors require that we reverse the defendant's convictions in this case and remand for a new trial.[28] Combined, the errors raise a substantial likelihood that, in the unusual circumstances of this case, justice was not done by the verdict. See, e.g., *Commonwealth* v. *Dwyer*, 448 Mass. 122, 138-139 (2006), and cases cited; *Commonwealth* v. *Cole*, 380 Mass. 30, 38-39 (1980). See also *Commonwealth* v. *Triplett*, 398 Mass. 561, 562 (1986) (finding that "a review of the record as a whole supports a

---

[27]The value of such an instruction was particularly high in this case, where the prosecutor's closing argument misled the jury by stating that a report had been made of the statements.

[28]We briefly address the issue of juror dismissal raised by the defendant, although it is unlikely to arise at a new trial. The defendant argues that the judge erred in dismissing a seated but unsworn juror who did not disclose on her juror questionnaire that she had once been charged with a crime. We discern no abuse of discretion in the dismissal where the juror explained that she failed to disclose the charge because, among other reasons, she believed that her record had been "expunged" and the charge was "ridiculous." The judge could permissibly infer from the failure to disclose involvement with the criminal justice system that the juror's impartiality and ability to follow the judge's instructions would be impaired. See, e.g., *Commonwealth* v. *Cousin*, 449 Mass. 809, 812-814, 821-822 (2007), cert. denied, 553 U.S. 1007 (2008) (dismissal was proper where juror failed to disclose her criminal record, and when confronted with it did not indicate that it was inaccurate).

conclusion that there is a substantial likelihood of a miscarriage of justice" requiring a new trial).

As described above, Keeler's testimony regarding the contents of the defendant's unrecorded statements was of unquestionable importance to the prosecution of this case. That Keeler was able to testify in such detail lent an aura of credibility to his testimony, see *Commonwealth* v. *Durling*, 407 Mass. 108, 121-122 (1990) (details and specificity inherently important to credibility and reliability), and the Commonwealth acknowledged that Keeler's credibility was a central issue in the case. See *Commonwealth* v. *Arana*, 453 Mass. 214, 228 (2009) (prejudice where central issue in case was victims' credibility and improperly admitted evidence bolstered credibility). Moreover, the prosecutor's closing argument emphasized and relied heavily on the detailed nature of Keeler's testimony. See *Commonwealth* v. *Tyree*, 455 Mass. 676, 702 (2010) ("The prosecutor repeatedly tied the defendant to the crimes by referring to tainted evidence, and referred to the tainted evidence in order to corroborate the testimony of the police officers . . . ."). Although there was other evidence strongly supporting the defendant's guilt, "the improperly admitted evidence had the dual purpose of both tying the defendant to the crime and supporting [the witness]'s credibility, thus intensifying the harm to the defendant's rights." *Id.* at 704.

The judgments are reversed, the verdicts are set aside, and the case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*

GANTS, J. (dissenting). I respectfully dissent. The court's decision to reverse the defendant's murder conviction rests on four grounds, all of which are in error for reasons I explain initially here and in more detail later. First, although the court recognizes that it must defer to a judge's findings of fact unless they are clearly erroneous, *ante* at 727, it failed to apply that standard of review when it concluded that the trial judge erred in finding that Detective Sergeant Daniel Keeler of the Boston police

department testified at trial to what the defendant had confessed *before* he invoked his right to counsel. Had the appropriate standard of review been applied, the court reasonably would have had to conclude that the judge's findings were not clearly erroneous.

Second, the court appears to conclude that, where a defendant's statement is suppressed because of a Miranda violation, the use of the statement to refresh a witness's memory as to what was said before the Miranda violation is a forbidden "fruit of the poisonous tree." As a result, the court appears to believe that, before testimony describing a previolation confession may be admitted in evidence, a judge must determine that the witness's memory of the previolation confession was not influenced by his review of the transcript of the recorded postviolation confession. *Ante* at 731. This plainly is not true under the United States Constitution and should not be true under art. 12 of the Massachusetts Declaration of Rights, because it would treat a confession that is suppressed because of a Miranda violation as if it were immunized testimony that may not be used in any way, directly or indirectly, to incriminate a defendant.

Third, the court holds that the judge below abused her discretion in limiting the scope of the defendant's cross-examination of Keeler. *Ante* at 737-738. A judge has "broad latitude to direct the course of a trial," including limiting the scope of cross-examination. *Commonwealth* v. *Vardinski*, 438 Mass. 444, 451 (2003). Here, the judge placed one limitation on the defense — that it could only raise once the fact that Keeler failed to take notes during the defendant's confession. This limitation does not constitute an abuse of discretion in the circumstances of this case. In addition, I know of no case (and the court cites none) where this court has concluded that a defendant is unfairly prejudiced by being denied the opportunity to repeat a point already made during cross-examination.

Fourth, the court finds that during closing argument the prosecutor asked the jury to draw an improper inference regarding the evidence that "substantially amplified" the other errors it identifies in the proceedings. *Ante* at 738-739. While I agree that the prosecutor's argument was improper, given the totality of the evidence against the defendant his one remark does not amount to reversible error.

Finally, the court declares that a new trial is required under its plenary power under G. L. c. 278, § 33E, because the judge failed to give the jury an instruction pursuant to *Commonwealth v. DiGiambattista*, 442 Mass. 423 (2004). *Ante* at 739-740. This is not an appropriate case to exercise our discretionary authority under § 33E to order a new trial because the judge was not required to give the *DiGiambattista* instruction where the defendant did not request it.

1. *Did the judge clearly err in finding that Detective Sergeant Keeler limited his testimony to what the defendant confessed before the Miranda violation?* Before trial, the motion judge allowed in part the defendant's motion to suppress his confession, finding that the defendant had invoked his right to counsel at the beginning of the tape-recorded interrogation, so the unrecorded interrogation was admissible but the recorded interrogation was not. On October 16, 2007, during the trial, the defendant filed a motion to limit the testimony of Keeler regarding the defendant's confession before the Miranda violation to the evidence elicited from Keeler during his grand jury testimony and in specific pages of the transcript of his testimony at the suppression hearing.[1] Based on this previously elicited evidence alone, which the defendant did not claim was inadmissible at trial, Keeler could have testified to the following facts regarding the defendant's confession:

Keeler obtained an arrest warrant against the defendant for the victim's murder and went to the Boston Medical Center to serve the warrant on the defendant. He entered the defendant's hospital room with Detective John Callahan, and advised the defendant that an arrest warrant had issued and he was going to be charged with murder. He then advised the defendant of his Miranda rights.[2] The defendant started crying and asked to

___

[1] At the motion in limine hearing, defense counsel said he would seek in writing to amend his motion, but there is nothing in the record that suggests that he did. Nor did defense counsel orally inform the judge at the hearing of the substance of the amendment.

[2] In his testimony at the suppression hearing, Keeler said that he did not use a Miranda card and provided the Miranda warnings from memory. He recalled that he told the defendant that he had the right to remain silent, that anything he said could and would be used against him in a court of law or other proceedings, that he had the right to have an attorney with him during questioning, that

speak with Keeler alone. Callahan left the room. Keeler then told the defendant that he was "in a heap of trouble," and that he understood that there was more than one person responsible. Keeler asked him, "Do you want to take the weight all yourself, do you want to take this all on your own?" The defendant explained that he "had been fronted a pound of marijuana" by a person named Hooker, and that "it wasn't supposed to go down that way. . . . [I]t was just a robbery; it wasn't supposed to be a murder."

The defendant explained that he and an unnamed second person had been solicited by Hooker to rob the victim. Hooker drove the defendant and the second person to the parking lot on Wales Street, "pointed it out, set up the robbery," and then went around the corner and let them out of the automobile. They walked back and positioned themselves by some trees in the rear of the apartment building. When the victim and others emerged from the building, the defendant and the second person approached the victim. The second person started firing at the victim with a large caliber revolver and then the defendant started shooting at the victim with a nine millimeter firearm, each shooting him several times.[3]

Before conducting a voir dire of Keeler, the judge read the transcript of the suppressed tape-recorded statement of the defendant, and informed counsel that she agreed with the prosecutor that Keeler could not have asked the leading questions he did on that recording unless the defendant had provided the information Keeler was confirming in the unrecorded portion of the interview.[4] My reading of the transcript of the suppressed recording confirms that the judge was correct. At the beginning of the transcript, Keeler asked the defendant a litany of leading questions regard-

if he could not afford an attorney one would be appointed for him at no cost, and that, if he wanted to stop answering questions and seek advice, he had the right to do that. After advising the defendant of each of these rights, Keeler asked whether he understood the right and the defendant said he did.

[3]Before giving this incriminating account, the defendant denied any involvement in the shooting, telling Keeler that he was walking down the street when he was accosted by "some guys out front," and was shot as he ran down the street.

[4]Defense counsel agreed with the judge's statement that "it seems to me impossible that the detective could ask the leading question without having had the information from the pretaped statement when it's a specific fact."

ing what the defendant had told him prior to the tape recording of the interrogation, to which the defendant generally answered, "Yeah" or "Okay." Through the leading questions alone, it was plain that Keeler had earlier learned from the defendant:

1. He was "fronted" a pound of marijuana by Hooker, who the defendant described as a Jamaican male, about thirty-seven to forty years of age, with a bald spot on top of his head.

2. The defendant sent $800 to someone who was ill in Jamaica, and Hooker said the defendant owed him $1,200.

3. Hooker spoke with the defendant as to how he wanted the defendant to resolve the debt.

4. Hooker called him the night of the shooting and picked him up in his automobile.

5. Hooker spoke with the defendant in his automobile about one block away from where the shooting took place.

6. The defendant, through a diagram, described the area of the shooting, including where the defendant and the second man stood.

The judge then asked defense counsel specifically to identify what subjects were discussed on the suppressed tape recording that had not been discussed earlier, and defense counsel identified only one subject: information about the firearm.[5] The judge conducted a voir dire of Keeler that focused on what the defendant said to Keeler before the suppressed tape-recorded interview regarding the defendant being given a handgun by Hooker and the second person's possession of a handgun. The judge credited Keeler's voir dire testimony that the defendant discussed

---

[5]The prosecutor had earlier conceded that the defendant had not discussed the make and color of Hooker's automobile or the defendant's path in approaching the victim before the shooting except in the suppressed tape recording. The judge barred Keeler from testifying about the defendant's statements regarding these subjects.

the two firearms before the tape-recorded interview and permitted him to testify at trial about the defendant's statements regarding these firearms. The judge's credibility findings are not properly the subject of appellate review, where the judge was present for Keeler's testimony, and we were not. See *Commonwealth* v. *Moon*, 380 Mass. 751, 756 (1980) ("The determination of the weight and credibility of the testimony is the function and responsibility of the judge who saw and heard the witnesses, and not of this court").

Where the defendant's motion in limine did not even seek to bar Keeler from testifying to the essence of the defendant's confession, where the leading questions in the tape-recorded transcript demonstrated that the defendant had confessed to the killing in some detail before the Miranda violation, and where the judge credited Keeler's voir dire testimony as to what the defendant had told him before the Miranda violation, the judge's findings as to what the defendant had confessed to Keeler before the Miranda violation were not clearly erroneous.

2. *Where a tape-recorded confession of the defendant is suppressed because of a Miranda violation, does the "fruits of the poisonous tree" doctrine forbid its use to refresh memory as to what the defendant said before the Miranda violation?* Under the United States Constitution, a "*Miranda* violation differs in significant respects from violations of the Fourth Amendment, which have traditionally mandated a broad application of the 'fruits' doctrine." *Oregon* v. *Elstad*, 470 U.S. 298, 306 (1985), discussing *Miranda* v. *Arizona*, 384 U.S. 436 (1966) (*Miranda*). Under *Miranda*, voluntary statements that are given without a Miranda warning must be excluded from evidence, but *Miranda* "does not require that the statements and their fruits be discarded as inherently tainted." *Id.* at 307. Voluntary, but unwarned, statements are therefore admissible for impeachment purposes, *id.*, and physical evidence obtained as a result of information learned from a voluntary statement that was procured in violation of *Miranda* is admissible in evidence. *United States* v. *Patane*, 542 U.S. 630, 637 (2004). Therefore, under Federal law, where a statement obtained in violation of *Miranda* may be used to uncover physical evidence during the investigation and for impeachment at trial, there can be no prohibition against its use to refresh a witness's memory.

Article 12 provides broader protections than the Fifth Amendment to the United States Constitution, and "where Federal law is insufficient to protect the broader rights against self-incrimination guaranteed by art. 12, we have adopted additional rules under the Massachusetts Constitution to secure those rights." *Commonwealth* v. *Simon*, 456 Mass. 280, 291 (2010). "Thus, when the Supreme Court held that voluntary but unwarned incriminating statements do not taint later questioning accompanied by Miranda warnings, . . . we concluded as a matter of State common law that such pre-Miranda questioning presumptively taints the subsequent statements." *Id.* This court has also declined to follow *United States* v. *Patane, supra,* and has held under our common law that physical evidence gathered as a result of information learned from a defendant's custodial statement obtained in violation of Miranda is a forbidden fruit of the Miranda violation and is not admissible in evidence. *Commonwealth* v. *Martin*, 444 Mass. 213, 214-215 (2005). In contrast, however, this court has followed Federal precedent in holding that voluntary, but unwarned, statements may be "admitted for impeachment purposes." *Commonwealth* v. *Ly*, 454 Mass. 223, 228 (2009).

This court has never concluded that the use of a statement obtained through a Miranda violation to refresh a witness's memory was prohibited under art. 12 or our common law. As the court recognizes, this court has long held that a witness's memory may be refreshed with a writing (or anything else) that is not itself admissible in evidence, and that the use of a writing to refresh memory does not open the door to the admission of the writing in evidence. See *ante* at 731, citing Mass. G. Evid. § 612(b) (2011). See also *Commonwealth* v. *McKenna*, 355 Mass. 313, 327 (1969); *Commonwealth* v. *Ford*, 130 Mass. 64, 66 (1881). Therefore, where a statement that is suppressed because it was obtained in violation of Miranda is used to refresh a witness's memory, it may be used only to refresh a witness's memory as to evidence that is admissible in evidence, such as the content of statements made by the defendant before the Miranda violation. The refreshed memory enabled through the use of a suppressed statement is not a fruit of the poisonous tree, because it results only in a better recollection of testimony that is independently admissible in evidence.

Refreshing memory does not open a back door to the admission of the suppressed statement. I understand that the court believes that Keeler used the transcript of the suppressed statement to claim falsely or mistakenly that the defendant made the same statement before the Miranda violation rather than to refresh his memory of what the defendant told him before the Miranda violation. *Ante* at 735-737. But this is not what the judge found after hearing, and it is less than the defendant claimed in his motion in limine. As discussed, the judge concluded that Keeler testified at trial to what the defendant told him before the Miranda violation, not after, and found the transcript of the suppressed tape recording helpful in ascertaining how much was said before the Miranda violation. I agree with the court that, once a prosecutor reasonably should recognize that a judge will need to find whether a defendant made a statement before or after a Miranda violation, a prosecutor should not refresh a witness's memory with the suppressed statement without the approval of the judge, because the judge may conclude that it will be easier to make this finding if the witness's memory is not refreshed. See *United States* v. *Weller*, 238 F. 3d 1215, 1221 (10th Cir. 2001). But there is a vast difference between granting a judge the discretion to prohibit or postpone the use of a suppressed Miranda statement to refresh a witness's memory if that will assist the judge in her fact finding, and setting such a high bar for use of a suppressed statement that its use is virtually impossible.

If the use of a suppressed statement to refresh memory, before or at trial, were a forbidden fruit of the poisonous tree of a Miranda violation, this court would essentially be treating a suppressed statement as if it were an immunized statement whose use, directly or indirectly, may taint a prosecution. Where a defendant has been granted immunity and compelled to testify at a grand jury, hearing, or trial, any evidentiary use of the immunized testimony to incriminate the defendant, whether it be to obtain an investigative lead or refresh memory, requires the dismissal of the criminal charge unless the error is harmless beyond a reasonable doubt. See *Kastigar* v. *United States*, 406 U.S. 441, 453, 460 (1972) (Fifth Amendment provides use and derivative use immunity of compelled testimony, including bar-

ring use of such testimony as "investigatory lead"); *Pixley* v. *Commonwealth*, 453 Mass. 827, 835 n.8 (2009), quoting *Attorney Gen.* v. *Colleton*, 387 Mass. 790, 795 n.4 (1982) (Fifth Amendment protects defendant from use or derivative use of compelled testimony, while Massachusetts Constitution requires transactional immunity for any offense "to which compelled testimony relates"); *United States* v. *North*, 910 F.2d 843, 856, *S.C.*, 920 F.2d 940 (D.C. Cir. 1990), cert. denied, 500 U.S. 941 (1991) ("use of immunized testimony by witnesses to refresh their memories, or otherwise to focus their thoughts, organize their testimony, or alter their prior or contemporaneous statements" is forbidden evidentiary use). Therefore, under the Fifth Amendment, where a defendant has given immunized testimony the Commonwealth must prove by a preponderance of the evidence that the testimony did not in any way taint the prosecution's case. See *id.* at 872-873 (convictions vacated and remanded to determine whether any use of immunized testimony before congressional committee was made either at trial or in grand jury).

The court suggests that a comparable analysis is appropriate where a report or transcript of a statement obtained in violation of Miranda has been shown to a witness who testifies at trial, and that the prosecution in such circumstances must prove that "the witness will testify not from a memory of the suppressed statement . . . but from an independent memory of the separate event." *Ante* at 731. We have not before transformed our "fruits of the poisonous tree" doctrine into a taint doctrine, and I fear that we will regret doing so, because the difficulty of proving that a witness's memory was not tainted by his knowledge of the content of a suppressed confession (or, for that matter, the evidence uncovered during a suppressed search) is formidable.

The issue properly before the judge was whether Detective Sergeant Keeler was testifying to what the defendant told him before the Miranda violation rather than after the Miranda violation, and the judge properly resolved that issue in her findings. The issue was not whether Keeler's memory as to what the defendant confessed before the Miranda violation was refreshed by, and not independent of, his review of the transcript of the defendant's tape-recorded confession after the Miranda violation.

The defendant never presented this issue to the trial judge. Nor should he have, because neither art. 12 nor our common law prohibits a witness from refreshing his memory of what a defendant said before a Miranda violation by looking at a transcript of what the defendant said after the Miranda violation, especially where the leading questions in the transcript essentially provide a summary of what the defendant told the interrogator before the Miranda violation.

3. *Did the judge abuse her discretion in limiting the defendant's cross-examination?* Judges have broad discretion to limit cross-examination as they see fit, and we will not reverse a ruling to limit the scope of cross-examination absent abuse of discretion and actual prejudice to the defendant. *Commonwealth* v. *Vardinski*, 438 Mass. 444, 451 (2003). "To determine whether the judge unreasonably limited cross-examination, 'we weigh the materiality of the witness's direct testimony and the degree of the restriction on cross-examination.' " *Id.*, quoting *Commonwealth* v. *Miles*, 420 Mass. 67, 72 (1995). Here, Keeler's direct testimony regarding the defendant's confession was certainly material but the restrictions the judge placed on his cross-examination were balanced and appropriate in the circumstances of this case.

Before trial, the prosecutor moved in limine to prevent the defendant from questioning Keeler about the lack of a report or recording regarding the defendant's statement, and contended that, if defense counsel were to pursue this line of questioning, he "would open the door to the admission of the suppressed statements and the recordings." At the pretrial hearing considering this motion, defense counsel declared that he would not question Keeler about the absence of a tape recording and would not argue to the jury that they should disbelieve him. Defense counsel told the judge, "I recognize I tread at my peril in regards to questioning about a statement that has been suppressed . . . ." The judge did not then rule on the motion, but instructed the prosecutor to make clear to Keeler "that he cannot volunteer that the defendant was put on tape unless the Court has made a decision that he can do that."

During trial, immediately after Keeler's voir dire, the judge said that she did not think defense counsel would question

Keeler about the lack of a recording and, if he did, she would "then consider the possibility" of giving the jury an instruction that the defendant was later tape recorded. She ruled that the defendant was entitled to elicit from Keeler that he did not make any notes or write a report of the interview. The prosecutor argued that the judge's ruling would "hamstring the Commonwealth" and create a "misimpression" for the jury if he were foreclosed from eliciting from Keeler the reason why he did not write a report. The judge declared that it would have been "good police practice" for Keeler to have taken notes during the unrecorded interview and that she would allow the defendant to question him about that. But she added that she would "consider the possibility" of providing an instruction to the jury if the defendant "overstated" the point and created a misimpression. She ultimately ruled that defense counsel could elicit from Keeler that he did not take any notes of the interview or write a report, but that if defense counsel did so more than once she would "revisit this issue."

In so ruling, the judge reasonably exercised her discretion to strike a balance that allowed the jury to learn that Keeler took no notes and wrote no report regarding his interview of the defendant, but prevented the jury from learning that Keeler did not write a report because the subsequent tape-recorded interview served to memorialize what had been said during the unrecorded portion of the interview. The judge did not abuse her discretion in ruling that, once defense counsel elicited during Keeler's cross-examination the absence of notes or a report, he should not repeat this line of questioning. A judge is plainly entitled to bar repetitive questioning. *Delaware* v. *Van Arsdall*, 475 U.S. 673, 679 (1986) ("trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant"). Nor is there any reason to believe that the jury would have been more persuaded that Keeler's testimony was unreliable if they heard more than once during his cross-examination that he took no notes and wrote no report.

4. *Did the prosecutor's improper statement during closing*

*argument create a substantial likelihood of a miscarriage of justice?* Defense counsel in his closing argument sought to discredit the testimony of Keeler regarding the defendant's confession by asserting, "[T]here is no notes, there's no report . . . ." In fact, Detective Callahan testified that he had written a report concerning the "interaction" he had witnessed between the defendant and Keeler in the hospital room. The prosecutor and defense counsel knew (but the jury did not) that the report simply referenced the tape recording that had been made during the latter part of the interrogation, and did not describe what was said before the tape recording, which was the part of the interrogation that was not suppressed. The prosecutor in his closing argument responded to defense counsel's assertion that there was "no report" by stating:

> "[T]he original statement is a statement to Detective Keeler. What do we have after that? We have Detective Callahan coming in the room and what happens? There's a conversation that ensued. The defendant's nodding, Detective Keeler's speaking. Detective Callahan documents that. Detective Callahan writes the report. Detective Callahan incorporates what the defendant has said. There was a report written on that statement, ladies and gentlemen. Don't be confused, don't be misled. The report is written by Detective Callahan concerning what happened when he came back in that room. He wrote a report."

I agree with the court that the prosecutor's argument was improper. While Callahan had written a report, it merely incorporated by reference the tape-recorded interrogation, which had been suppressed and was not the portion of the interrogation to which Keeler was allowed to testify. In attempting to refute the defense counsel's incorrect assertion that there was "no report," the prosecutor improperly suggested that Detective Callahan "incorporate[d] what the defendant ha[d] said" during the confession to which Keeler testified, when the report merely referenced what the defendant had said during the suppressed tape-recorded interrogation.

The defendant, however, made no objection to the prosecutor's closing argument, so the standard of review is whether the pros-

ecutor's improper argument created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Semedo*, 456 Mass. 1, 15 (2010). In determining whether the prosecutor's closing statements created a substantial likelihood of a miscarriage of justice, "one significant fact to consider is the strength of the evidence against the defendant." *Commonwealth* v. *Fowler*, 431 Mass. 30, 42 (2000). In view of the overwhelming evidence of the defendant's guilt in this case, there was no substantial likelihood of a miscarriage of justice. Deoxyribonucleic acid evidence and blood that matched the defendant's were found on one of the two firearms that fired the shots that struck the victim. The firearm was found in front of 85 Wales Street, not far from the scene of the killing at 37 Wales Street, and a trail of blood led from the firearm to where the defendant was hiding underneath a wheelchair ramp, with a gunshot wound to his thigh. Various nine millimeter casings — from a gun other than the ones used to shoot the victim — were found in the driveway and on the sidewalk in front of 37 Wales Street. The compelling inference was that the defendant had been wounded in this exchange of gunfire after he shot and killed the victim. Apart from the circumstantial evidence, the defendant confessed to the killing the next day, and provided details that conformed to the physical evidence of the killing, including the types of firearms used to shoot the victim. It is farfetched to imagine that the jury would have concluded that Keeler falsely manufactured the defendant's confession had the prosecutor not made this improper suggestion in his argument and, in light of the totality of the evidence, even more unlikely that the verdict would have been different.

5. *Were there errors that make a new trial more consonant with justice under § 33E?* Where, as here, the judge did not err in admitting Keeler's testimony regarding the defendant's unrecorded confession, and where the prosecutor's closing argument, though improper, did not create a substantial likelihood of a miscarriage of justice, the court's grant of a new trial under § 33E must rest on its conclusions that the judge erred in not instructing the jury in accordance with *Commonwealth* v. *DiGiambattista*, 442 Mass. 423, 447-448 (2004) (*DiGiambattista*), about the detective's failure to record the defendant's initial custodial interrogation.

I agree that such an instruction, if it had been requested by the defendant, should have been given to the jury, but the record reflects that it was never requested, and the judge is not required to give the instruction in the absence of a request. In *DiGiambattista, supra*, this court declared:

> "[W]hen the prosecution introduces evidence of a defendant's confession or statement that is the product of a custodial interrogation or an interrogation conducted at a place of detention (e.g., a police station), and there is not at least an audiotape recording of the complete interrogation, the defendant is entitled (*on request*) to a jury instruction advising that the State's highest court has expressed a preference that such interrogations be recorded whenever practicable, and cautioning the jury that, because of the absence of any recording of the interrogation in the case before them, they should weigh evidence of the defendant's alleged statement with great caution and care. Where voluntariness is a live issue and the humane practice instruction is given, the jury should also be advised that the absence of a recording permits (but does not compel) them to conclude that the Commonwealth has failed to prove voluntariness beyond a reasonable doubt." (Emphasis added.)

Here, Keeler chose not to tape record the initial part of the interview where he spoke alone with the defendant but did tape record the second part of the interview, where in the presence of Callahan he reprised through leading questions what had been said earlier and asked additional questions to obtain further details. Under *DiGiambattista*, a defendant "is entitled (on request)" to the designated jury instruction where, as here, there is not an audiotape recording of the "complete interrogation." *Id.* A *DiGiambattista* instruction cannot be avoided by obtaining a confession from a defendant without a recording, and then confirming the confession in a later recorded interview. But I do not agree with the court that the judge erred in failing to provide a *DiGiambattista* instruction where the defendant never requested it.

Before trial, the prosecutor moved to limit the scope of the defendant's cross-examination regarding the absence of a recorded statement, noting that the recorded statement was declared

inadmissible as a result of the defendant's motion to suppress and that, as a result, the prosecution is not able to rebut the inference that no part of the interrogation was recorded. See *DiGiambattista, supra* at 448-449 ("It is of course permissible for the prosecution to address any reasons or justifications that would explain why no recording was made, leaving it to the jury to assess what weight they should give to the lack of a recording"). At a pretrial hearing, the trial judge, in addressing the prosecutor's motion, declared, "[C]ertainly the defendant cannot benefit . . . from a *DiGiambattista* charge in a situation where a judge has decided that the statement that is taped is suppressed." Defense counsel did not challenge this assertion and proffered to the judge that he would not "make an argument that this defendant was not taped so therefore . . . there is some reason to disbelieve the police." Moments later the judge stated, "I'm saying I'll have to decide before the charge what to do with *DiGiambattista*. But I have to wait and see what the testimony is and make some judgments then."

At trial, the judge said that she had "to grapple with whether I give [a] *DiGiambattista* [instruction]. At the moment I'm not inclined to give it because it seems to me that would be just a distortion of reality to give the jury something when, in fact, he was taped. But that's what we're going to have to balance." Defense counsel replied, "We sort of toyed with the *DiGiambattista* [issue]. We don't think that's appropriate." Because the defendant never asked for a *DiGiambattista* instruction and characterized giving it as not "appropriate," the judge was spared the need to "grapple" with whether to give the instruction, or how it should be worded. By failing to request the instruction, the defendant waived his entitlement to it.[6]

Because there is no sound reason to order a new trial, I respectfully dissent.

---

[6] It is perhaps for this reason that able appellate counsel did not argue that the judge erred in failing to give an instruction pursuant to *Commonwealth* v. *DiGiambattista*, 442 Mass. 423 (2004). Nor has the defendant claimed that his trial counsel was ineffective for failing to request the instruction.