### UNITED STATES v. RAPPY.
#### No. 36, Docket 20290.

Circuit Court of Appeals, Second Circuit.
Nov. 6, 1946.

Writ of Certiorari Denied Jan. 13, 1947.

See 67 S.Ct. 501.

---

Louis H. Solomon, of New York City, for appellant.

Martin J. McLaughlin and John F. X. McGohey, U. S. Atty., both of New York City, for appellee.

Before L. HAND, SWAN, and FRANK, Circuit Judges.

L. HAND, Circuit Judge.

Rappy appeals from a conviction for possessing, in company with one, Essig, goods, stolen while they were being imported into the United States.[1] He raises three questions: (1) The sufficiency of the proof that the goods found in Essig's possession were stolen during importation; (2) the failure to prove possession by him, as distinct from Essig; (3) the admission in evidence of a written statement, taken in preparation for trial, from one, Moskowitz, a witness for the prosecution. The facts in outline were as follows: The steamer, "Yaka," arrived at the Port of New York in November, 1945, carrying a number of cartons of Swiss watch movements. The custom authorities set apart upon the pier two of these cartons for ex-

---

[1] § 409, Title 18, U.S.C.A.

amination, of which, when they came to be removed, one was found to have been rifled. Another carton of those described on the "Yaka's" manifest was missing upon the outturn. On December 3rd, Rappy telephoned to one, Weinstein, asking him whether he could use some watch movements; Weinstein said "no," but that he might find a buyer. Later Rappy and Essig went to Weinstein's office where was also one, Moss, a decoy. Essig produced two sample watch movements of the same kind as those described on the manifest; and later Essig bought about 1300 such movements which, in Rappy's presence, Essig said had been stolen in France. Essig also said that he was giving Rappy one dollar for each movement out of ten dollars, the agreed price. Rappy, Essig and the decoy were arrested as they left Weinstein's office. Earlier Rappy, over the telephone, had offered to one, Moskowitz, a haberdasher, watch movements which Rappy described as "hot"—a thieves' word for stolen—but Moskowitz would have nothing to do with them. After his arrest Rappy went to Moskowitz's shop and told him, if he should be interviewed, not to tell any government agents of their telephone talk.

■ The documents, put in evidence by the prosecution to prove that the watch movements had been imported, were of four kinds. First, was the manifest of the "Yaka" which recorded the cartons as part of the cargo; second, were the bills of lading delivered for the cartons; third, was a "delivery record book" kept by a contractor employed by the steamship company, in which truckmen in New York had written receipts of delivery of the cartons; fourth, were some official records kept by Custom House officials. The last were proved to be official documents, and became competent as such to prove their contents. As to the first three the prosecution apparently meant to avail itself of § 695, Title 28 U.S.C.A., and supposed that it had fulfilled the conditions of that statute, when it proved that the documents had been kept "in the regular course of any business" of the steamship company. That was not quite enough, for it is in addition necessary to show that "it was the regular course of such business to make such memorandum or record at the time." Rappy objected generally that the "proper foundation had not been laid" for the admission of the documents; and, although from his cross-examination his objection appears really to have been because the witness had no first hand acquaintance with the recorded transactions, nevertheless we might have found some embarrassment in sustaining the ruling, if the supporting testimony had not in fact supplied the missing proof. We take judicial notice that it is the uniform maritime "course of business" for the master, or the mate, when he issues bills of lading to enter upon them cargo, and only cargo, which has come over the rail, or at least what the carrier has already received; and that he does this at approximately the time of receipt. Hence to prove that a given bill of lading was issued in the regular course of the ship's business is also to prove that it was the duty of the entrant to make the entries as records of the facts recorded. As to the manifests we also take judicial notice that they are made up from the bills of lading, and that it is part of the duty—usually of the mate or other executive officer—to prepare them at the time the ship breaks ground, or soon thereafter. They are evidence that the ship has actually lifted the cargo described, when taken in connection with the bills of lading themselves. As to the "delivery record book," the contractor of the steamship kept it, and the consignees' truckmen acknowledged in it the receipt by them of the goods delivered. Although we can take no judicial notice of any such practice, the testimony—at least when unchallenged—was enough to show prima facie that it was a part of the contractor's "regular course of any business" to require the truckmen so to record their deliveries; and there is no difference between entries made by the contractor as part of his own business, and entries made by the truckmen severally at the contractor's insistence.

■ The second objection is that the evidence showed that Essig alone was in possession of the watch movements and that for this reason no case was made against Rappy. This is quite devoid of substance. If Rappy was not in possession, he was patently an abettor of Essig, and as

such he could be indicted as a principal.[2] It is true that the judge told the jury that Rappy was guilty only if they found him personally in possession, although it might be a joint possession with Essig; and we must assume that the jury so found. Hence it might be argued that, if the evidence did not justify a verdict based upon Rappy's joint possession with Essig, the jury ought to have acquitted him. Whatever be the logic of this, nothing in the record raises the point. Rappy made no objections to the charge, and his motion for a directed verdict was properly denied, because there was clearly evidence enough to hold Rappy as an abettor. We might intervene if it appeared that justice had gravely miscarried; but it is apparent that it did not, for we cannot seriously entertain the possibility that a jury which—perhaps erroneously—found that Rappy had had joint possession with Essig, would have acquitted him if it had been instructed that abetting Essig made him equally guilty.

The last objection has more substance. As we have said, before he went to Weinstein with Essig, Rappy called up Moskowitz on the telephone and offered him some of the movements: so far Rappy himself agreed with Moskowitz. The important question was whether in that talk Rappy said that the movements were "hot," and whether he later went to Moskowitz and told him not to tell any government agent, who might interview him, of the telephone talk. Moskowitz had signed a written statement for a government agent in which he said that Rappy had told him on the telephone that the movements were "hot," and that Rappy had later come to him and told him to say nothing of the telephone talk, but only to say that Rappy was his customer. On the stand Moskowitz did not remember, or said he did not remember, that Rappy had told him that the watches were "hot," until the prosecution showed him the statement, after which he said that it refreshed his recollection and that Rappy had spoken as the statement recorded. This was the only use made of the paper on the direct, although it may be that it in fact served to refresh Moskowitz's memory also as to his interview with Rappy after the arrest. On cross-examination Rappy sought at great length to get from Moskowitz an admission that at the interview when the statement was prepared, it was the agent who introduced the word, "hot," and as to this Moskowitz's testimony was somewhat confused. Moreover, Moskowitz said that Rappy had not put the price of $10, or any price, upon the movements in the telephone talk as the statement declared. Finally, Moskowitz said that he had signed the statement because he feared the agent, and that he might be involved in the theft. After the cross, re-direct, and re-cross had been long directed to the preparation and execution of the statement, the prosecution offered it in evidence and the judge received it. The question is whether this was erroneous.

■ When a party uses an earlier statement of his own witness to refresh the witness's memory, the only evidence recognized as such is the testimony so refreshed; and the party may not put the statement in evidence, although the other side may do so, and apparently the jury may call for it, sua sponte.[3] This is a consequence of the general doctrine that corroboration of a witness by an earlier consistent version of his testimony is not competent. The conventional reason is that it does not give greater credence to a witness's story that he has said the same thing before, though there are concededly some exceptions. Were the matter res integra it would seem that there might be more, for the exceptions do not in fact exhaust the occasions on which earlier consistent statements are rationally corroborative. However, we assume, in accord with the general doctrine, that the statement at bar was not competent, unless Rappy made it so by his cross-examination of Moskowitz. Anything may in fact revive a memory: a song, a scent, a photograph, and allusion, even a past statement known to be false. When a witness declares that any of these has evoked a memory, the opposite party may show, either that it has not evoked what appears to the witness as a memory, or that, although it may so appear to him, the

[2] § 550, Title 18, U.S.C.A.    [3] Wigmore, § 763.

memory is a phantom and not a reliable record of its content. When the evoking stimulus is not itself an account of the relevant occasion, no question of its truth can arise; but when it is an account of that occasion, its falsity, if raised by the opposing party, will become a relevant issue if the witness has declared that the evoked memory accords with it. This is true because the evoked memory cannot be a truthful record when it tracks a statement shown to be false. Hence in the case at bar, when Rappy chose to attack the veracity of the statement which Moskowitz had said evoked an accordant memory, he interjected a new issue, and the prosecution was entitled to meet his attack. It was obviously proper that upon that issue the statement itself should be in evidence.

Judgment affirmed.