## GENERAL FOODS SALES CO., Inc. v. THE FELIPE CAMARAO et al.

United States District Court
S. D. New York.
June 9, 1948.

Bighan, Englar, Jones & Houston, Henry N. Longley and John W. R. Zisgen, both of New York City, for libelant.

Purrington & McConnell, Frank J. McConnell and James D. Brown, both of New York City, for respondent.

KENNEDY, District Judge.

The libel in this cause alleges a claim in rem and in personam against respectively the S. S. Felipe Camarao and her owners, Lloyd Brasileiro Patrimonio Nacional

(herein for brevity called Lloyd). The claim arises from a short delivery of a shipment of Brazil nuts which the libelant, General Foods Sales Company, Inc. (herein for brevity sometimes called General), had ordered from Companhia Industrial do Brasil (herein for brevity called the shipper).

On June 27, 1942, respondent Lloyd, a common carrier of goods by sea for hire, issued its on-board bill of lading No. 47 attesting to the fact that Camarao had received at Para, Brazil, from the shipper for delivery to the libelant 10,000 bags of Brazil nuts, freight prepaid. This merchandise was the total amount of an order placed by libelant with the shipper, the latter being bound to deliver the goods on board a steamer at Para no later than July 1, 1942.

On July 15, 1942, Camarao sailed from Belem for New York, but on the way she was rerouted by naval authority to Pensacola, where she arrived on August 13, 1942. Meanwhile, and on July 21, 1942, Manufacturers Trust Company, a banking institution, had presented to Goldman Sachs & Co. a draft in the sum of $122,750. accompanied by the on-board bill of lading, together with other shipping documents. The amount of this draft, plus banker's commission, was paid by libelant through Goldman, Sachs & Co.

As I have said, Camarao arrived at Pensacola on August 13, 1942; she completed the discharge of her cargo on August 19, 1942. Her manifest and her stowage plan both showed as being on board the total amount of libelant's merchandise (10,000 bags) covered by the bill of lading. But on the completion of discharge, it was discovered that there was an outturn of only 4,326 intact bags belonging to libelant (and unidentified sweepings totaling approximately 495 bags). I digress for the moment to say that it later developed that the amount of intact bags short-shipped (5,674) had been laden into respondent's ship S. S. Osorio on August 14, 1942.

Upon the arrival of Camarao at Pensacola, General had engaged one Smith, an independent forwarder, warehouseman and ship operator doing business at Tampa, to supervise the discharge of the steamer. Respondent Lloyd was represented by one Zumsteg. There ensued a discussion between Smith and Zumteg concerning what was to be done about the short-shipment. Neither had any general authority of any kind to bind the corporation for which he acted.

On August 21, 1942, two days after the shortage was discovered, the shipper appears to have advised libelant that the remainder of the merchandise was coming forward on another steamer which was thought to be the Maua, then due or en route to New York. In response to a cable addressed to it by the libelant, the shipper by letter dated August 27, 1942, informed libelant that the short-shipped merchandise was on board still another steamer belonging to respondent Lloyd, S. S. Osorio.

I have already mentioned that the goods which respondent Lloyd failed to deliver ex Camarao had been laden into Osorio in Para on August 14, 1942. The steamer last mentioned sailed from Belem on September 27, 1942, and was on the following day sunk by enemy action. On October 9, 1942, libelant requested from respondent Lloyd a certification that the missing merchandise was on board Osorio when she went down; the request for certification identifies these goods, saying "that the consignment we refer to was covered by bill of lading 47 issued in Para". On February 6, 1943, Lloyd furnished libelant with the materials for a proof of loss. This was filed on March 15, 1943. It ultimately led to a payment by an insurance carrier to libelant in the amount of $147,923.77. On July 6, 1943, libelant began this suit.

It may be a cause of wonder how a steamer could issue its bill of lading and make entries in its manifest and stowage plan covering goods which were not on board at all. Under such circumstances, respondent is impelled to admit that it is estopped to deny that it carried the goods and failed to deliver them, even if failure to lade and deliver the cargo was caused by an act of God. Olivier Straw Goods Corporation v. Osaka Shosen Kaisha, (The Alaska Maru) 2 Cir., 1928, 27 F.2d 129,

certiorari denied 278 U.S. 618, 49 S.Ct. 22, 73 L.Ed. 540.

Although the explanation that follows does not help respondent Lloyd, it seems clear that as of July 1, 1942, an embargo (by the United States) against the shipment of Brazil nuts was to go into effect. Consequently, buyers like the libelant took care to make their contracts of purchase provide for delivery prior to the deadline date. And the wildest confusion undoubtedly existed at Brazilian ports, such as Para. It is likely that cargo of this sort was simply laden huggermugger into any bottom that was available, and that the sanctity of documents like bills of lading and manifests, cf. United States v. Rappy, 2 Cir., 1947, 157 F.2d 964 was forgotten. As I say, this explanation does not help respondent Lloyd: it has no choice except to concede, as it does, that on August 19, 1942, it was guilty of a thorough-going breach of its contract of carriage.

But respondent Lloyd asserts, as its sole defense, that this breach of its contract was waived. There is at stake, of course, the question of liability for loss of the cargo on S. S. Osorio. If libelant is still entitled to assert its claim of short delivery, then respondent Lloyd's bill of lading does not excuse it. On the other hand, if the breach was waived by a course of conduct on the part of libelant, then respondent Lloyd is exonerated, because loss of cargo by enemy action is excepted under that same bill of lading.

█ I have used the term "waiver" to characterize the defense asserted by Lloyd. If terminology makes any difference it probably comes closer to a claim of novation. In support of this defense, Lloyd does not and could not assert that it is excused merely because libelant protected itself by insurance and collected on its policy. In fact, in its brief, Lloyd plainly says that this fact, standing by itself, is of no very great significance. This is a wise concession: "The equities existing between libelant and the underwriters are no concern of the respondent." Federal Forwarding Co. v. Lanasa, 4 Cir., 1929, 32 F.2d 154, 157.

But Lloyd urges that libelant's conduct in asserting its insurance claim is but one step in a course of conduct, which constitutes forgiveness of the short delivery on the Camarao, willingness on the part of libelant to abandon all of the rights of General that sprang from that breach, and acceptance by libelant, in lieu of those rights, of a promise merely to ship the undelivered merchandise—a promise which came to nothing in a practical sense because the action of the enemy intervened.

If one analyzes the course of conduct upon which respondent relies, it is certain that no one step taken by General could be called definitive, or even anything more than equivocal. As I have said, between August 19, 1942, the date the shortage was discovered, and probably August 28, 1942, no one concerned in the affair really knew what had become of the lost cargo.[1] The conversations and discussions between the respective representatives of libelant and respondent Lloyd are of the vaguest sort, to say nothing of the fact that each was an agent of very limited scope of authority. Respondent's representative indeed admitted at the trial that when he told Smith (acting for libelant) that respondent had a ship at or due New York with the short-shipped goods, he was thinking of S. S. Maua, and that he soon discovered that the lost merchandise was not in that ship. In fact, it appears to have been the libelant who first advised the respondent that the missing goods were on S. S. Osorio. There was not any commitment by either side, so far as I can see, of any kind during this period, nor for that matter after it. Libelant, through its representative Smith, actually told respondent on August 24, 1942, that "we are holding the matter of filing claim in abeyance for the present". And at the trial respondent's agent (Zumsteg) at first plainly described the understanding between himself and libelant's agent as one under which "if the nuts were not to arrive or were not shipped, then, of course, he (Smith) would

---

[1] The letter of advice that the goods were on board Osorio, sent by the shipper to General, is dated August 27, 1942, and went by air mail. I am, therefore, assuming that it was received on August 28, 1942.

file his claim". I asked Zumsteg whether it was his understanding that Smith was withholding the filing of a claim if the goods should "arrive" or whether he (Smith) meant that the claim was in abeyance if the goods were "shipped", and the witness replied "if they did not arrive or they were not shipped". I mention this point only to indicate the lack of any basis for a claim that the talks between the two agents in themselves rose to the dignity of a waiver or a novation, even if Zumsteg's first and spontaneous version of the matter be accepted.[2]

Until after S. S. Osorio was notified sunk, no significant dealings between the parties took place. When this fact became known, libelant then asserted its claim against its insurance carrier, based upon the very same bill of lading which is the keystone of its claim here. But it seems to be a current practice to forward short-shipped cargo under the original bill of lading, and indeed to make entries at the Custom House under that same document. So that again, standing by itself, the assertion by libelant of a claim against the carrier based on that bill of lading is no evidence whatever that it had relinquished its rights already accrued (August 19, 1942) against the common carrier, the respondent here.

Respondent relies to a very large extent on two deviation cases, one American and one British, both arising out of the same controversy: The Tregenna, 2 Cir., 1941, 121 F.2d 941, 944; and Tate & Lyle Ltd. v. Hain S. S. Co. Ltd., [1936] 55 Ll. L. R. 159. It may well be that in the carriage of goods by sea the effect of deviation is no different than the effect of any other breach of contract and, therefore, the deviation cases can supply a pattern of decision even for a case where an on-board bill of lading is issued and entries made in a manifest and stowage plan, although the goods are not in the ship at all.[3] But, assuming that to be so, neither of these cases is, on the facts, anything like the case at bar. In those cases, through a curious series of blunders, the carrying ship had failed to make a call for cargo which she was bound to make. While homeward bound for Queenstown the mistake was corrected, she was ordered back to the overlooked port, and there she stranded. The fact of the deviation was known to all of the parties concerned, and no one protested. It was, therefore, held in our circuit court and in the House of Lords that the deviation was excused. It seems to me that the point in The Tregenna, supra, is to be found in the language of Judge Learned Hand where he says that the deviation was discovered while the voyage was in progress, and that without any protest or reservation the ship was allowed to make good her fault so far as she could. The case at bar is quite different. Camarao's voyage had ended and she was in default. The vaguest kind of negotiation, if it can be called such, was then carried on. Upon learning that the undelivered portion of its merchandise had been destroyed, libelant then invoked its rights under its own policies. There was no question of a ship continuing a voyage with the tacit approval of the shipper, and after knowledge on his part of the default. The fact is that unknown to the parties the short-shipped goods had been laden into Osorio even before the shortage had been discovered at Pensacola. To argue that under these circumstances, a considered agreement, tacit or express, was made between General and respondent Lloyd, with full knowledge of the facts under which General would abandon any rights arising from such a grave breach as that committed by Camarao is to press skepticism too far. And the same observation might well be made of any claim that respondent, by libelant's conduct, was led into the belief that the original contract had been abandoned, for which reason it, the respondent,

---

[2] Zumsteg later in his testimony eliminated the "arrival" proviso.

[3] Deviation, if proved, really substitutes for the original contract a new one under which the carrier is stripped of its exemptions. To say that deviation is just like any other breach of contract may, therefore, be a statement too sweeping: other breaches do not have such drastic consequences.

had pursued a course of action which it might not otherwise have adopted.

There is another possible approach to the problem which produces the same answer. Suppose that after the short shipment became known, Lloyd, the carrier, agreed to make every effort to find and deliver the missing merchandise. Suppose, further, that at the time of this offer the American market price for Brazil nuts had become prohibitive (and one might well infer that this would be the normal effect of the embargo). Clearly, the dictates not only of its legal duty but of common sense would command General to preserve the status quo at least until it had learned that it was impossible for Lloyd to repair the damage. For, under such circumstances, if General were to pay a prohibitive price in the open market to replace the lost shipment, and subsequently Lloyd tendered delivery of an equivalent amount of merchandise, General could not recover the difference. On August 19, 1942, and while the possibility of delivery existed, General was under a duty to mitigate the damage, a duty which it would violate by precipitate action in the way of an ill-advised purchase. From this point of view, General's conduct becomes not a waiver of breach, but merely a sensible effort to mitigate the consequences. In view of the embargo, it is highly likely that General, in the late summer and early fall of 1942, was extremely anxious to secure the merchandise and preferred that result to a law suit. But this is not necessarily inconsistent with an intention on its part to assert its rights already ripened, if the merchandise was ultimately shown to be irrevocably lost.

The insurance feature of the case, as I have said, presents on the surface, at least, what seems to be an anomaly: that General can be made whole under its contract of insurance, and still recoup its damages against the carrier. But respondent makes no point of this, I suspect because it is in the last degree unlikely that any policy of marine insurance permits such a result.

Libelant is entitled to the interlocutory decree which it asks for with costs. Nothing I have said above is to be construed as prejudging questions arising in connection with the measure or quantum of damage or the right to interest. These matters can be dealt with when and if they arise.

I have filed findings of fact and conclusions of law.