## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 58432-8-II |
| Respondent, | |
| v. | ORDER GRANTING MOTION TO PUBLISH AND PUBLISHING OPINION |
| JASON DANIEL CECIL, | |
| Appellant. | |

Respondent, State of Washington, has moved to publish this court's opinion filed on June 3, 2025. After consideration, the court grants the motion. Accordingly, it is

**ORDERED** that the final paragraph in the opinion which reads "A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record pursuant to RCW 2.06.040, it is so ordered." is deleted. It is further

**ORDERED** that the opinion will now be published.

**FOR THE COURT**

**PANEL**: Jj. CRUSER, PRICE, CHE

_____
PRICE, J.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 58432-8-II |
| Respondent, | |
| v. | |
| JASON DANIEL CECIL, | UNPUBLISHED OPINION |
| Appellant. | |

PRICE, J. — Jason D. Cecil appeals his conviction for first degree animal cruelty. Cecil argues that (1) the trial court erred in allowing an expert witness to provide testimony about domestic violence, (2) the trial court erred in allowing the admission of coached testimony from a witness at trial, (3) the cumulative effect of the trial court's errors denied him of a fair trial, and (4) the trial court erroneously imposed the crime victim penalty assessment (VPA).

We affirm Cecil's conviction but remand for the trial court to determine whether Cecil is indigent and to reconsider the imposition of the VPA based on that determination.

FACTS

I. BACKGROUND

One day in August 2020, Cecil learned that his dog apparently snapped at one of the children in the household. This caused Cecil to begin chasing and beating the dog. When the dog eventually bit Cecil's thumb, Cecil grabbed a kitchen knife and cut the dog's leg. Three children who witnessed the incident, A.V., A.D., and B.B., later told Cecil's wife, R.C., what had been

done to the dog.[1] The next day R.C. took the dog to the veterinarian for medical care. Cecil instructed R.C. to tell the veterinarian that the dog had injured itself, not that Cecil had cut the dog (R.C. complied with those instructions).

About one year later in August 2021, R.C. filed a petition for an order of protection against Cecil. At that point, R.C. changed her story about the dog's earlier injury; among other allegations in her petition, she disclosed that Cecil had cut the dog with a knife the previous year. Following a subsequent investigation, the State charged Cecil with multiple criminal offenses, including some involving domestic violence. But after certain domestic violence charges were severed, this matter moved forward with one count of first degree animal cruelty.[2]

Prior to trial, several interviews took place. In December 2021, R.C. was interviewed by law enforcement, during which she discussed the incident in August 2020 when Cecil cut the dog. Then, over a year later, defense counsel conducted an audio-recorded interview of A.V. about the incident.

As the case approached trial, Cecil said that he would be claiming self-defense.

---

[1] Two of the children share the same initials for their first and last names. Our record does not disclose middle initials for either child, so we have used fictious last initials to refer to them as "A.V." and "A.D." for clarity.

[2] The State initially charged Cecil with second degree assault, first degree child molestation, and first degree animal cruelty. The assault and child molestation charges were later severed from the animal cruelty charge. Sometime after the charges were severed, the State moved to dismiss the assault and child molestation charges and refiled the animal cruelty charge against Cecil as a separate cause.

II. MOTIONS IN LIMINE

One of the State's proposed witnesses was Dr. Robert Welch, an expert in domestic violence. In a pretrial motion in limine, Cecil sought to exclude Dr. Welch under ER 402, ER 403, ER 404, and ER 702. Cecil noted that certain domestic violence charges had been severed from his animal cruelty charge. With this context, Cecil argued that Dr. Welch's testimony about domestic violence was more prejudicial than probative because, even though the charge had been limited to animal cruelty, the jury would infer that domestic violence occurred in the household. Cecil also argued that Dr. Welch's testimony was inadmissible under ER 702 because it would not assist the jury to understand the evidence or determine a fact in issue.

The State responded that Dr. Welch's testimony was relevant to explain R.C.'s behavior and its theory of the case. The State said that Cecil had told R.C. to lie to the veterinarian and say that the dog had injured itself. By explaining the dynamics of a domestic violence relationship, Dr. Welch could explain R.C.'s fear and why she would be willing to lie to the veterinarian. The State further argued that Dr. Welch would help explain R.C.'s delayed disclosure to law enforcement. The State argued:

> Yes, and she also did not make a report to the police. And you know, this doesn't come up until, as I explain later, the investigation happens. So, outside the common experience, it's the—okay, well, but it's the dog. You know, why not tell somebody about what happened to the dog. And it's because of that control. The dynamic of, as the expert will explain, of the person who's been abused always trying to remain close to the abuser so as not to prompt violence, anger, additional controlling behavior to herself and to the children.
>
> And so, when—the timing of when she makes these statements to law enforcement is also important because the expert will explain, as the cycle of violence, you know, goes around and there's this disordered thinking, and she then says, okay, well, now that he's out of the house and she feels safer, and she's obtained a protective order where she says I'm a victim of domestic violence, does she then disclose to the police. . . .

3

So, what I explained here is the delayed disclosure, the trauma of being a victim all the time and having to walk on eggshells, is—while it's becoming more culturally widespread that people understand the dynamic, it really is something that is very specific and—and can assist the jury in making a decision about whether that's reasonable given the situation that she'll testify to, that she lied to the vet and that she delayed disclosure to law enforcement.

1 Verbatim Rep. of Proc. (VRP) at 64-65. The State concluded by also connecting Dr. Welch's testimony of its theory of the case—that Cecil injured the dog in a rage and then controlled the household to avoid responsibility:

So, we also have what the [c]ourt just talked about, whether it's domestic violence that the defendant is raging against the dog like this, and—and then controlling the household after it's done.

1 VRP at 66.

The trial court denied Cecil's motion to exclude Dr. Welch. The trial court explained that it had reviewed relevant case law and noted that a qualified expert is able to explain the conduct of victims which would otherwise be beyond the average juror's understanding. The trial court also referenced the case of *State v. Abdi-Issa*,[3] saying it "basically" held that an act of violence against an animal can be "considered an act of domestic violence." 1 VRP at 78. Ultimately, the trial court concluded that Dr. Welch's testimony was admissible so long as it satisfied the other

---

[3] 199 Wn.2d 163, 504 P.3d 223 (2022). In *Abdi-Issa*, our Supreme Court held that a jury was properly instructed that it could find that animal cruelty was a crime of domestic violence, stating:

In 2009, the legislature recognized that "considerable research shows a strong correlation between animal abuse, child abuse, and domestic violence. The legislature intends that perpetrators of domestic violence not be allowed to further terrorize and manipulate their victims, or the children of their victims, by using the threat of violence toward pets." This shows that our legislature recognized the relationship between animal abuse and domestic violence.

*Id.* at 173 (quoting LAWS OF 2009, ch. 439, § 1).

requirements of ER 702. But, at the same time, the trial court took steps apparently designed to minimize prejudice to Cecil. For example, the trial court took the unusual step of ordering the State to provide to Cecil in advance a list of questions that it might ask Dr. Welch when he was on the stand.

Cecil sought additional clarity. He asked whether the trial court's ruling would permit the State to characterize the household as "a domestic violence situation." 1 VRP at 81. The trial court explained that it would give the State some leeway to present its theory of the case to explain why Cecil "did . . . what . . . he did." 1 VRP at 83. But the trial court cautioned the State against discussing acts related to separate domestic violence charges that had been severed because of the resulting prejudice. The State agreed to refrain from mentioning the severed charges.

III. TRIAL

After jury selection and opening statements, the State began its case.[4] A.V., A.D., B.B., R.C., the veterinarian, a detective, and Dr. Welch all testified consistently with the recitation above.

A. A.V.'S DIRECT EXAMINATION

A.V. was the first to testify about the night of the incident. She explained that after Cecil learned that the dog had supposedly bit B.B., she heard thumping and a loud banging sound and the dog whimpering in pain. She then saw Cecil punch, kick, and throw the dog "all throughout the house," as well as beat it with an extension cord. 1 VRP at 119. According to A.V., Cecil was "really angry" and putting a lot of energy into hitting the dog. 1 VRP at 122. At some point, the

---

[4] Neither jury selection nor opening statements were transcribed.

dog bit Cecil, and Cecil responded by grabbing a kitchen knife and slicing the dog's leg. After providing this description, A.V. testified that she did not remember Cecil talking to R.C. before R.C. took the dog to the veterinarian:

> [State:] Okay. And before [R.C.] went to the vet, was your dad there?
>
> [A.V.:] I don't remember.
>
> [State:] Okay. Do you remember your dad talking to you—[R.C.] before [R.C.] went to the vet?
>
> [A.V.:] No.

1 VRP at 139. Shortly thereafter, the trial ended for the day.

The following day, after a series of questions, the State asked A.V. whether reviewing a text message she sent to her mother would help her better remember where Cecil chased the dog.[5] Cecil objected, arguing that A.V. had not previously stated that she did not remember this information until the State introduced the idea. The trial court excused the jury, and Cecil further argued that the State was improperly introducing the fact that A.V. did not remember something. The trial court overruled Cecil's objection.

With the return of the jury, the State asked A.V. whether she remembered "everything that happened that day" and about texts she may have sent her mother. 1 VRP at 189. The following exchange took place:

> [State:] Do you remember everything that happened that day?
>
> [A.V.:] No.
>
> [State:] Okay. And did you text some details to you mom?
>
> [A.V.:] Yes.

---

[5] R.C. is A.V.'s stepmother, not her biological mother. Although our record does not contain the text message, it appears that A.V. sent this message to her biological mother.

[State:] And did you text your mom details about what happened in the bedroom?

[A.V.:] Yes, but I don't remember exactly what I would have said.

[State:] Okay.  Would reading the text help you remember?

[A.V.:] Yes.

1 VRP at 189.

The State then showed A.V. a text message and asked her to read the message silently to herself.  After reviewing the text message, A.V. confirmed that she now better remembered the incident.  The State then asked whether she heard "other sounds coming from the bedroom." 1 VRP at 190.  A.V. responded that she heard "the dog just being thrown into . . . the dresser and there was just a lot of banging."  1 VRP at 190.

The State then asked A.V. to recall her testimony from the previous day when she did not remember what Cecil had said to R.C. before she took the dog to the veterinarian.  The State asked whether there was something that would refresh her memory, and A.V. said an audio recording of her defense interview.  The State then asked if A.V. had listened to the recording that morning in the prosecutor's office.  A.V. confirmed that she had, that it helped her remember, and that she now recalled what Cecil had told R.C. to tell the veterinarian.  A.V. then testified that "[Cecil] told [R.C.] that the story for the vet was that he ran away and just cut his leg on a . . . fence.  And that he came back with it just on his leg." 1 VRP at 199.  A.V. clarified that she had not been instructed by anyone about what to say in court.

B.  Cecil's Motion for a Mistrial and Cross-Examination of A.V.

After the conclusion of A.V.'s direct examination, Cecil moved for a mistrial on two bases. First, he argued that the State improperly used the text message to coach A.V. in violation of ER 612.  Cecil alleged that the text message supplanted A.V.'s testimony and speculated "that [A.V.]

7

was shown [the text message] prior to her testimony here today." 1 VRP at 205. Second, Cecil

argued that the State

> took it upon [itself] . . . to play that recording back to [A.V.] before [A.V.] testified today without the [c]ourt being involved at all. And given those practices, the [c]ourt can't now un-ring the bell and, on that basis, we make a motion for a mistrial.

1 VRP at 206.

The State denied there was any witness coaching. The State noted that it did not show

A.V. the text message in advance of her testimony, and even though it had played small portions

of the audio recording to A.V. prior to the second day, doing so was not improper.

The trial court reserved on ruling on the motion, and the case proceeded with A.V.'s cross-

examination, which included questions from Cecil about the events leading up to the refreshing of

her recollection. For example, Cecil asked A.V. about the length of the audio recording that she

listened to that morning before her testimony. A.V. responded that it was "like probably five, six

seconds." 1 VRP at 221. A.V. also explained that she had not reviewed any other materials

between the two days of her testimony, aside from a single diagram.

One day later, the trial court denied Cecil's motion for a mistrial. The trial court

emphasized that any prejudice was minimized by Cecil's opportunity to cross-examine A.V. about

the process of refreshing her recollection.

C. R.C.'S TESTIMONY

R.C. took the stand and explained that Cecil had instructed her to lie about the incident or

he would harm the dog. She testified that Cecil told her that if she did not tell the veterinarian that

the dog had injured itself, he "would put the dog down." 1 VRP at 352. She believed that Cecil would shoot the dog if she did not comply with his demands.

R.C. next testified about the dynamics of her marriage with Cecil. R.C. explained, without objection, that she was afraid of Cecil because she had experienced physical and psychological abuse as well as controlling and manipulative behavior from Cecil in the past. R.C. testified that it was this fear of Cecil that caused her to lie to the veterinarian and not report the incident to law enforcement until much later. She also testified that at the time of the trial, she and Cecil were in the process of getting a divorce.

On cross-examination, Cecil appeared to challenge R.C.'s credibility based on the delay of her disclosure of the incident and child custody issues. The following exchange occurred:

> [Defense counsel:] All right. You lived with [Cecil] until, well, August of the next year, correct?
>
> [R.C.:] July of the following year.
>
> [Defense counsel:] Almost a year later, right?
>
> [R.C.:] Correct.
>
> . . . .
>
> [Defense counsel:] . . . [Y]ou filed a petition for an order of protection, didn't you?
>
> [R.C.:] I did.
>
> . . . .
>
> [Defense counsel:] You filed August the 24th, correct?
>
> [R.C.:] I believe so, yes.
>
> THE COURT: And this is 2021, right?
>
> [R.C.:] Correct.
>
> [Defense counsel:] In—sorry. 2021. That's important. And in that petition, you testified earlier yesterday that you wrote, in August 2020, he—that is [Cecil]—cut my dog with a knife, right?
>
> [R.C.:] Correct.

[Defense counsel:] Subsequently filed for divorce, right?

[R.C.:] Yes.

[Defense counsel:] You have custody of the child that you share with [Cecil], right?

[R.C.:] Yes.

[Defense counsel:] He doesn't have visitation rights at this point, right?

[R.C.:] He hasn't with any of his children.

. . . .

[Defense counsel:] *Now, despite writing that in August,* 2020, he—that's [Cecil]—cut my dog with a knife, *you didn't tell anybody in law enforcement, including [the detective], about this incident involving . . . the dog until the interview that you did with [the detective] on December the 1st, 2021, correct*?

. . . .

[R.C.:] I'm not sure.  Possibly.

1 VRP at 409-411 (emphasis added).

D.  DR. WELCH'S EXPERT TESTIMONY REGARDING DOMESTIC VIOLENCE

Dr. Welch, the domestic violence expert, also testified.  The State's direct examination largely followed the list of questions that were shared in advance with Cecil (as ordered by the trial court).  Dr. Welch began by explaining that he had a doctorate in psychology specializing in marital and family therapy and that he had previously testified as an expert in the area of domestic violence and sexual assault.

After his background, Dr. Welch testified about the dynamics of domestic violence, including what he called the "cycle of domestic violence":

[T]he cycle of violence in an intimate relationship is when folks have this intense initial attraction. . . It turns violent for whatever reason.  It explodes at that point where there is a breaking apart, temporarily, of the relationship, but then there is this instantaneous remorse, apologies, and guilt where the offending party in a domestic violence situation goes overboard to try to compensate for what they—for any behavior which they obviously say will never happen again.  The other person who doesn't really want to have the tragedy of ending the relationship, wants

to forgive the person, will come back into a honeymoon phase where everything is okay for a while until it gets violent again. . . .

. . . .

That cycle repeats over and over and over.

1 VRP at 476-77.

Dr. Welch also explained that domestic violence can also be committed through emotional abuse. This emotional abuse "might include implied threats of harm to somebody they care about or something they care about." 1 VRP at 478.

Dr. Welch further explained that domestic violence could involve pets in the household. Abusers, for example, might use violence against pets as a means to exert additional control over the household. A victim might not immediately report an act of violence against a pet due to fear of more violence for the pet and likened such an occurrence to a "hostage situation." 1 VRP at 482. He also explained that if an abuser asked a victim to lie about an act of violence against a pet, the victim would likely feel compelled to lie.

Dr. Welch testified that these behaviors of a victim could be counterintuitive to a person unfamiliar with domestic violence. Although the general public might expect a victim to report an abuser's act of violence, he testified that it is more common for a victim to not report:

> [State:] Okay. Are any of the person's reactions sometimes considered to be counterintuitive?
>
> [Dr. Welch:] Not from a psychological point of view, no.
>
> [State:] Okay. And to a layperson who does not have your psychological point of view, can they—can sometimes be considered counterintuitive?
>
> [Dr. Welch:] For a layperson, they probably are very counterintuitive. Who would think, why aren't you telling somebody about this? Yes, that would be very counterintuitive to a layperson. But it—from a psychological point of view, it is much more expected that they would not report. And research backs that up. It— it is very common, much more common, to not report.

11

1 VRP at 483-84.

But if the individual being abused was eventually able to separate from the abuser and get a support system in place, Dr. Welch testified that such a situation would likely result in the victim disclosing the abuse:

> [State:] And—and I've got one question and—and then we can stop. Which is, so, if a support system gets into place and the future relationship with the accused will be limited because the people are not together anymore, are these factors that would —that could play into the person's decision to finally report?
>
> [Dr. Welch:] Oh, absolutely. Those would be incredibly predictive of reporting.

1 VRP at 486-87.

Still, Dr. Welch's testimony was presented generally, without directly tying his opinions to the specific facts of the case. Both during his direction examination and cross-examination, Dr. Welch acknowledged that he did not know any of the facts involved in the case or know the actual dynamics of Cecil's relationship with R.C.

During cross examination, Cecil also asked Dr. Welch about his familiarity with a term called "parental alienation syndrome." 2 VRP at 512. The following exchange occurred:

> [Defense counsel:] So, I wanted to ask you, as well, you've talked a little bit about your experience, your education. You shared some of the positions that you've held over the years. Are you familiar with parental alienation syndrome?
>
> [Dr. Welch:] I am.
>
> [Defense counsel:] And can you explain for the jury what that is?
>
> [Dr. Welch:] Briefly, it's the systematic effort of one spouse to dismantle the relationship the other parent has with the children by creating as much distance and ill feeling as possible.
>
> [Defense counsel:] And have you seen that in the course of your practice?
>
> [Dr. Welch:] I have.

2 VRP at 512.

After Dr. Welch's testimony, the detective testified. Following which, the State rested.

E. CECIL'S TESTIMONY

Cecil testified in his defense. He said that on the day of the incident, B.B. told him that she had been bit by the dog. Cecil also said that he did not believe that B.B. had been bit by the dog because she did not have any bite marks. But he claimed that he was not angry with B.B.

Cecil claimed that he went looking for the dog and observed it eating food on the kitchen table. As a result, Cecil "spanked" the dog on its bottom "pretty hard." 2 VRP at 552. The dog then jumped off the table and Cecil began chasing it around the house. Eventually the dog bit Cecil's thumb. Cecil admitted that he then grabbed a knife "[t]o defend [himself]" and cut the dog; he testified that it was because the dog "jumped up" at him, trying to bite him again, and a toddler was standing about three feet away from the dog. 2 VRP at 566-67.

Apart from spanking and cutting the dog, Cecil denied kicking it, hitting it with an extension cord, or otherwise injuring the dog.

Following the incident, Cecil admitted that he asked R.C. to lie to the veterinarian, but he claimed that he did so only to avoid the dog being placed on a deadly animal list and to avoid any further custody issues with the children. Cecil claimed that he did not coerce or force R.C. into lying to the veterinarian. Cecil also denied that he had ever physically abused R.C. and did not "think" that he had psychologically abused her. 2 VRP at 587.

IV. CLOSING ARGUMENTS

In closing arguments, the State's theory was that Cecil cut the dog out of anger. The State characterized Cecil as being "[i]n a rage" when he thought the dog had bitten B.B. and observed the dog eating from the table. 2 VRP at 762.

> [T]he defendant had to inflict punishment on that dog. And he dragged the dog out of the kennel, and he hit it, and he kicked it, and he whipped it with an extension cord. And the chase was on.

2 VRP at 762.

The State also addressed Cecil's claim of self-defense and argued that Cecil was clearly the first aggressor because cutting the dog was not a reasonable amount of force to respond to a dog bite. The State characterized Cecil's conduct as angry and manipulative, concluding, in part, with,

> All of the kids were upset and traumatized by this event in the household. When the defendant says things like, either you lie for me or I'm putting the dog down, that's controlling behavior. It's manipulative behavior. . . . He's telling the kids to lie for him. He's telling his wife to lie for him because he knows that he has done something wrong. He knows he was angry and upset. Hell yeah, I cut the dog. And it was all because he could not control his own anger or rage . . . .
>
> This is somebody who had inflicted substantial pain on [the dog] and who caused a physical injury on [the dog], who was an initial aggressor, who does not have self-defense available to him. . . .

2 VRP at 779-80.

Cecil's theory of the case was far different. Defense counsel argued that Cecil did not abuse the dog and attempted to control the dog only because of the safety issues of having young children in the household. Defense counsel also suggested that after the dog bit Cecil, he had no alternative but to cut the dog out of self-defense—"there isn't a lot of protection that you have as a person if you've already been bitten by the animal. And he's still acting aggressively." 2 VRP at 785.

Defense counsel also suggested that Dr. Welch's testimony about domestic violence was of limited value to the jury. Defense counsel reminded the jury that Dr. Welch did not know the

facts of the case and that he was able to provide general information only based on hypothetical questions.

But defense counsel did suggest that some of Dr. Welch's testimony might be relevant, except that it supported Cecil, not the State. Defense counsel referenced Dr. Welch's testimony about "parental alienation syndrome" and claimed that there were certain family dynamics at play, including a pending divorce and child custody issues, between Cecil and R.C., which demonstrated that certain witnesses were biased and had motives to lie:

> And when we asked [Dr. Welch], just to provide some more information about parental alienation syndrome, what is that? He was able to talk to you all, but that is when one spouse tries to alienate another parent from their children, to try to create that distance, to breach that relationship.
>
> So, I would ask, if you're thinking about that expert's testimony, also think back to those moments. What else did he talk about? Parental alienation syndrome, which we know is relevant because everybody would concur that there are some family dynamics in play at the moment. [R.C.] and . . .Cecil are going through a divorce. There's child custody on the table. He's got some child custody things going on with the other children. It has been a couple of years since he's seen some of these kids.
>
> And so, I would ask you to think about credibility, motive, bias. As the fact finders, that is something that you can assess with each of these witnesses. Think about people's motivations when they come here in court to testify.

2 VRP at 787-88.

V. VERDICT, SENTENCING, AND APPEAL

Following its deliberations, the jury found Cecil guilty as charged. The trial court imposed a sentence of 60 days. Cecil's judgment and sentence contained empty boxes next to boilerplate language about whether Cecil was indigent, and the trial court made no findings regarding indigency. Still, the trial court imposed the VPA.

Cecil appeals.

15

ANALYSIS

Cecil makes four main arguments. First, he argues that the trial court erred in allowing Dr. Welch to testify about domestic violence. Second, Cecil argues that the trial court erred in admitting "coached" testimony from A.V. and in denying his related motion for a mistrial. Third, Cecil argues that the cumulative effect of the trial court's errors denied him of a fair trial. And fourth, he argues that the trial court erroneously imposed the VPA.

I. DR. WELCH'S EXPERT TESTIMONY ABOUT DOMESTIC VIOLENCE

Cecil first argues that Dr. Welch's testimony was irrelevant, unfairly prejudicial, and not harmless. We disagree that the trial court erred in admitting this testimony.

We review the trial court's decision to admit or exclude evidence for an abuse of discretion. *State v. Gunderson*, 181 Wn.2d 916, 922, 337 P.3d 1090 (2014). An abuse of discretion occurs when the decision was manifestly unreasonable or based on untenable grounds or reasons. *Id.*

Relevant evidence is admissible. ER 402. "Relevant evidence" is defined under ER 401 as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

Even if relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. ER 403. Evidence is unfairly prejudicial when it is more likely to create an emotional response from a jury instead of a rational decision. *State v. Scherf*, 192 Wn.2d 350, 388, 429 P.3d 776 (2018).

Here, Cecil argues that Dr. Welch's testimony about the "cycle of domestic violence" was not relevant to the crime of animal cruelty. Br. of Appellant at 26. He identifies aspects of Dr. Welch's testimony that he claims were especially irrelevant, including that an abuser could hold

others in a " 'hostage situation,' " which could result in a failure to report the violence or lie about it to others. Br. of Appellant at 34 (quoting 1 VRP at 482). Cecil acknowledges that the "ostensible purpose" of this testimony was to explain R.C.'s delay in reporting the incident, but he contends the trial court broadly permitted testimony which exceeded that purpose and which could not be linked to the facts of the case or the elements of the actual criminal charge. Br. of Appellant at 31.

It is true that Dr. Welch's testimony about domestic violence was not directly relevant to an element of the crime of animal cruelty. However, the testimony was relevant for two main reasons. First, to support the State's theory of the case, that Cecil cut the dog out of rage and not in self-defense. And second, to explain R.C.'s behavior, including her delay in reporting the incident to law enforcement.

The State's theory was that Cecil cut the dog out of rage, while Cecil's theory was that he acted in self-defense. Cecil supported his theory by portraying his actions as being motivated by concern for the safety of the children in the household and that his actions with the knife were only reasonably intended to protect himself from an overly aggressive dog. The State was entitled to respond to this defense by characterizing Cecil's behavior as unreasonably violent.

Some of the support for the State's response came from the eyewitnesses. For example, A.V. described Cecil as "really angry" when he was hitting the dog. 1 VRP at 122. But Dr. Welch also provided the jury an explanation for why Cecil would have been unreasonably violent during the incident. He testified that the dynamics of domestic violence can explain why a relationship can suddenly turn violent and that this type of abuse can be directed at pets. Especially when R.C.'s own testimony about the physical and psychological abuse she suffered from Cecil gave foundational support for this dynamic, Dr. Welch's testimony was relevant to support the State's

theory of unreasonable rage. *See State v. Harris*, 97 Wn. App. 865, 872, 989 P.2d 553 (1999) ("Evidence tending to establish a party's theory, or to qualify or disprove the testimony of an adversary, is always relevant and admissible."), *review denied*, 140 Wn.2d 1017 (2000).

Beyond supporting the State's theory of the case, Dr. Welch's testimony was also relevant to explain R.C.'s behavior and the inconsistencies in her reporting of the incident. Indeed, almost one year passed between the date of the incident when R.C. lied to the veterinarian and the date when she changed her story to disclose that Cecil actually intentionally cut the dog. Under most circumstances, this delay would create suspicion about the witness's truthfulness, and in fact, Cecil, himself, drew the jury's attention to this delay during his cross-examination of R.C. when he asked,

> Now, despite writing that in August, 2020, he—that's [Cecil]—cut my dog with a knife, you didn't tell anybody in law enforcement . . . about this incident involving . . . the dog until the interview that you did with [the detective] on December the 1st, 2021, correct?

1 VRP at 411.

Dr. Welch's testimony addressed this delay. He testified that if an abuser asked a victim to lie about an act of violence against a pet, the victim could feel compelled to lie. Dr. Welch explained that ordinarily he would not expect an abused individual to report an incident. However, if the person being abused was able to separate from the abuser, he testified that those circumstances "would be incredibly predictive of reporting." 1 VRP at 487. This testimony lines up with R.C.'s failure to report the incident until after she had petitioned for a protection order from Cecil.

This type of information has long been considered appropriate for expert testimony under ER 702 because the dynamics of domestic violence are outside the understanding of the typical juror. *See State v. Ciskie*, 110 Wn.2d 263, 272-79, 751 P.2d 1165 (1988) (observing that the general public is "unaware of the extent and seriousness of the problem of domestic violence" and holding that expert testimony about the issue was helpful to the jury's understanding of a matter outside the competence of an ordinary lay person). Consistent with this, Dr. Welch testified that the general public would not typically understand why a victim might delay in reporting abuse.

Although Cecil frames his argument largely as one of relevance, his argument appears to actually focus on the potential for unfair prejudice of this testimony. Without question, this testimony was prejudicial—the concept of domestic violence can be provocative to a jury. However, the trial court took steps to minimize the risk of *unfair* prejudice. For example, the trial court cabined Dr. Welch's testimony to predictable topics by requiring the State to provide to Cecil, in advance, a list of the questions it would be asking Dr. Welch. And during its direct examination of Dr. Welch, the State largely stuck to this list of questions.

Moreover, the risk of unfair prejudice was further minimized by Cecil's effective cross-examination of the witness. Not only was Cecil able to confirm that Dr. Welch had no familiarity with the actual facts of the case, Cecil was able to solicit testimony from Dr. Welch that was arguably helpful to the defense. Cecil questioned Dr. Welch about the concept of parental alienation syndrome, which he defined as "the systematic effort of one spouse to dismantle the relationship the other parent has with the children by creating as much distance and ill feeling as possible." 2 VRP at 512. And in closing argument, Cecil raised this concept to challenge R.C.'s

bias and motivations (i.e., implying that R.C. could be lying and manipulating the children related to custody issues).

Given the relevance of Dr. Welch's testimony to the State's theory of the case and R.C.'s delayed disclosure of the incident to law enforcement, and given the steps taken to minimize its prejudicial effect, we conclude that the trial court did not abuse its discretion in admitting Dr. Welch's testimony.[6]

II. COACHING THROUGH REFRESHING RECOLLECTIONS

Cecil next argues that the trial court abused its discretion by admitting testimony that was improperly coached by the State. Cecil contends the State violated ER 612 when it purported to refresh A.V.'s recollection with a text message and with the audio-recorded defense interview. Relatedly, Cecil argues that the trial court abused its discretion in denying his motions for a mistrial for these two instances. We disagree.

---

[6] Cecil makes a passing reference to ER 702 in his briefing, which governs the admission of expert testimony. Expert testimony is admissible if " '(1) the witness qualifies as an expert, (2) the opinion is based upon an explanatory theory generally accepted in the scientific community, and (3) the expert testimony would be helpful to the trier of fact.' " *In re Pers. Restraint of Morris*, 176 Wn.2d 157, 168-69, 288 P.3d 1140 (2012) (quoting *State v. Allery*, 101 Wn.2d 591, 596, 682 P.2d 312 (1984)). Here, aside from alleging that Dr. Welch's testimony was unhelpful because it was irrelevant, Cecil provides no meaningful analysis for how the trial court allegedly violated ER 702 in admitting Dr. Welch's testimony about the cycle of domestic violence. And, as mentioned above, this type of testimony has previously satisfied challenges on ER 702 grounds. *See Ciskie*, 110 Wn.2d at 272-79. Because Dr. Welch's testimony was relevant and Cecil provides no further meaningful analysis about the application of ER 702, we do not further address it.

No. 58432-8-II

A. LEGAL PRINCIPLES

The procedure for refreshing a witness's memory at trial is addressed in ER 612. The rule provides,

> If a witness uses a writing to refresh memory for the purpose of testifying, either: while testifying, or before testifying, if the court in its discretion determines it is necessary in the interests of justice, an adverse party is entitled to have the writing produced at the hearing, to inspect it, to cross-examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness. . . .

ER 612.

Case law further explains that certain conditions must be met before a witness may use a writing to refresh their memory. *State v. McCreven*, 170 Wn. App. 444, 475, 284 P.3d 793 (2012), *review denied*, 176 Wn.2d 1015 (2013). For example, the witness's memory must need to be refreshed and the trial court must be satisfied that the witness is not being coached. *Id.* A witness is considered coached if the writing is used to supplant the witness's memory, but not if the writing merely aids the memory. *Id.*

There are few limitations on the writing used merely to refresh the witness's memory. *Columbia State Bank v. Invicta Law Group PLLC*, 199 Wn. App. 306, 327, 402 P.3d 330 (2017). For example, the writing does not need to be admissible and it is not important when the statement was made so long as it refreshes the witness's memory. *Id.* Ultimately, the witness's testimony is the evidence, not the writing. *Id.* at 328.

Although ER 612 refers to writings, a party is not precluded from using other means to refresh the witness's memory. 5D ELIZABETH A. TURNER & KARL B. TEGLAND, WASHINGTON PRACTICE: COURTROOM HANDBOOK ON WASHINGTON EVIDENCE § 612:1, at 343 (2024-2025 ed.)

21

("In an often-quoted opinion, it is said that a witness's memory may be refreshed by 'a song, a scent, a photograph, an allusion, even a past statement known to be false.' " (quoting *United States v. Rappy*, 157 F.2d 964, 967 (2d Cir. 1946))).

We review the trial court's denial of a mistrial motion for an abuse of discretion. *State v. Emery*, 174 Wn.2d 741, 765, 278 P.3d 653 (2012).

B.  APPLICATION

Cecil argues that the State improperly refreshed A.V.'s recollection under ER 612 in two instances—with the text message and with the audio recording.  With respect to the text message, Cecil begins by pointing out that on the first day of A.V.'s testimony, she testified about the incident and, at no time, did she claim that she exhausted her memory or that she needed to "refer to extrinsic writings or texts."  Br. of Appellant at 38.  Yet, on the second day of trial, Cecil contends that, in response to a leading-type question from the State, A.V. suddenly claimed that she did *not* remember "everything that happened" on the day of the incident.  Br. of Appellant at 38.  Cecil appears to suggest that the State manufactured this scenario in order to improperly use the ER 612 process to get A.V. to repeat what was in the text message.

It is true that on the first trial day, A.V. testified in detail about the incident, but Cecil exaggerates the completeness of her recollection.  For example, A.V. did testify that there were certain things she could not remember—including the critical issue of whether Cecil spoke to R.C.

prior to going to the veterinarian.[7] But even if Cecil is correct that some sort of shift occurred the next trial day, Cecil is merely speculating that this supposed shift is rooted in improper coaching by the State. And, critically, Cecil had the opportunity to probe any potentially improper conduct by the State in its witness preparation by cross-examining A.V. During that cross-examination, A.V. denied that she had reviewed any written materials, which would have included text messages, prior to the second day of trial except for a diagram. Thus, we are unpersuaded that Cecil has shown any violation of ER 612 related to the text message.

With respect to the audio recording, Cecil makes a similar argument. Reciting the sequence of events, Cecil again argues that A.V. did not originally have any difficulty in remembering the details of the incident. According to Cecil, on the first day of trial, A.V. testified that she did not remember Cecil speaking with R.C. before the dog was taken to the veterinarian, but she also gave no indication that anything would help refresh her recollection. Yet, on the following day, the State revisited that question and, this time, A.V. stated that listening to an audio recording of her interview with defense counsel would help refresh her memory. Then she told the jury that she had *already* listened to the audio recording with the State earlier that day.

---

[7]Again, the following exchange took place on the first date of A.V.'s testimony:

> [State:] Okay. And before [R.C.] went to the vet, was your dad there?
>
> [A.V.:] I don't remember.
>
> [State:] Okay. Do you remember your dad talking to you—[R.C.] before [R.C.] went to the vet?
>
> [A.V.:] No.

1 VRP at 139.

As with the text message, Cecil contends that when the State asked the question of whether A.V. could remember "everything" (when no person could reasonably answer that question with anything other than "no"), this "induced or created testimony" when none otherwise existed.  Br. of Appellant at 43 (internal quotation marks omitted).  And Cecil suspects that the State prepared A.V. in advance for improperly using this process as an excuse to create testimony through coaching.[8]

While we agree that this chronology could be suggestive of potential liberties with the tool of ER 612, Cecil again relies too heavily on suspicion and provides no evidence of an actual violation.  A.V. testified that in between trial days, she heard only short snippets of the recording and was shown only a single diagram.  And she testified that no one told her what to say on the stand.  As with the text message, Cecil also had the opportunity to cross-examine A.V. about the audio recording.  Nothing in that cross-examination revealed that the audio recording supplanted her memory or that she had otherwise been urged to create testimony by the State.  Thus, as with the text message, Cecil has failed to show a violation of ER 612 related to the audio recording.[9]

---

[8] Cecil also mentions the concept of prosecutorial misconduct when discussing his allegations of witness coaching.  But because Cecil fails to provide any analysis under the standards applicable to that type of claim, we view his mention of prosecutorial misconduct as merely supporting his argument that the trial court erred, rather than as constituting a separate assignment of error.  Thus, we do not further address it.

[9] Because no violation of ER 612 occurred when the State used the text message and audio recording to refresh A.V.'s recollection, the trial court did not abuse its discretion in denying Cecil's motion for a mistrial.

III. CUMULATIVE ERROR

Cecil argues that the cumulative error doctrine warrants reversal of his convictions. The cumulative error doctrine provides that a defendant may be entitled to a new trial when cumulative errors result in a fundamentally unfair trial. *Emery*, 174 Wn.2d at 766. Under the cumulative error doctrine, the defendant must show that the combined effect of multiple errors requires a new trial. *State v. Clark*, 187 Wn.2d 641, 649, 389 P.3d 462 (2017). Here, Cecil has not established that any error, or combination of errors, denied him a fair trial.

IV. VPA

Cecil argues that the trial court erroneously imposed the VPA because it did not make a finding about whether or not he was indigent. The State responds that Cecil waived any challenge to the VPA and that, in any event, Cecil was not indigent because he is a skilled tradesman.

Effective July 1, 2023, the VPA is no longer authorized for indigent defendants. LAWS OF 2023, ch. 449 § 1; RCW 7.68.035(4). Changes to the legislation governing legal financial obligations apply to cases on direct appeal when the change was enacted. *State v. Ellis*, 27 Wn. App. 2d 1, 16-17, 530 P.3d 1048 (2023), *review granted*, 4 Wn.3d 1009 (2025). Because Cecil's case is still on direct appeal, this legislative change applies to Cecil.

Here, the trial court did not make any findings about indigency during sentencing. And checkboxes on Cecil's judgment and sentence pertaining to indigency were left blank. As a result, we are unable to evaluate the State's argument about whether Cecil was not in fact indigent. Accordingly, we remand for the trial court to address solely the narrow issue of whether Cecil is indigent for the purposes of imposing the VPA.

CONCLUSION

We affirm Cecil's conviction but remand for the trial court to determine whether Cecil is indigent and to reconsider the imposition of the VPA based on that determination.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
PRICE, J.

We concur:

_____
CRUSER, C.J.

_____
CHE, J.